**MOBILFONE OF NORTHEASTERN PENNSYLVANIA, INC., Appellant,**

v.

**COMMONWEALTH TELEPHONE COMPANY.**

**No. 77–1585.**

United States Court of Appeals, Third Circuit.

Argued Dec. 8, 1977.

Decided Feb. 8, 1978.

Boris Shapiro, Barry M. Harvis, Verlin, Goldberg, Epstein, Beller & Shapiro, Philadelphia, Pa., for appellant.

Henry Kolowrat, Stephen A. Stack, Jr., Dechert Price & Rhoads, Philadelphia, Pa., for appellee.

Before ALDISERT and WEIS, Circuit Judges, and CHRISTENSEN, District Judge.*

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal requires us to decide if the rule of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942), can be invoked to deny relief sought under the federal antitrust laws by one radio-telephone paging common carrier, certified by the Pennsylvania Public Utilities Commission [PUC], against another PUC-certified carrier. Appellant, Mobilfone of Northeastern Pennsylvania, Inc., sought a permanent injunction to restrain Commonwealth Telephone Company from establishing a one-way radio-telephone paging service in the greater Wilkes-Barre area. It alleged that Commonwealth violated sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and the Clayton Act, 15 U.S.C. § 26. Determining that the *Parker* rule barred relief, the district court entered summary judgment in favor of Commonwealth. Mobilfone has appealed. We affirm.

### I.

Mobilfone currently furnishes a one-way radio-telephone paging service in the Wilkes-Barre area. It describes its service as follows:

[T]elephone users merely dial an ordinary telephone number terminating in Mobilfone's automatic radio signaling system, wait for the beep tone and then dial [Mobilfone's] subscriber's assigned number. This number activates the subscriber's receiver to sound an alerting tone.

(Brief for Appellant at 3.)

Mobilfone owns no telephone lines; it must rent its interconnecting lines from the Bell Telephone System. Commonwealth, on the other hand, as the sole telephone franchise in the Wilkes-Barre area serving approximately 100,000 customers, has its own wire transmission lines and has refused to make them available to Mobilfone.

In order to engage in radio-telephone paging service in Pennsylvania, Commonwealth was required to obtain a certificate of public convenience from the Pennsylvania PUC. It was successful in its application, notwithstanding a protest filed by Mobilfone. Before the state PUC, Mobilfone unsuccessfully raised the same contentions it presented to the district court: that Commonwealth's greater resources would allow it to use revenues derived from its telephone service to subsidize non-compensatory rates in its paging service, and that this situation will destroy Mobilfone as a competitor in the one-way signaling business. In its opinion accompanying the order granting Commonwealth's application, the PUC explained:

The Commission is not convinced that a reasonable measure of competition between radio-telephone common carriers is undesirable, particularly in a metropolitan district such as the Scranton, Wilkes-Barre area; that the number of subscribers served by protestant [Mobilfone] after furnishing radio-telephone paging service for approximately 16 years (the record indicates that paging service was initiated in 1957) is indicative of the existing needs for such service in the area; or

---

* Honorable A. Sherman Christensen, of the United States District Court for the District of Utah, sitting by designation.

that a reasonable competitive situation in this instance would not be of public benefit. Furthermore, although the financial resources of applicant [Commonwealth] are unquestionably of much greater magnitude than protestant's, the furnishing of one-way radio-telephone paging service by an established operating telephone utility is a logical extension of its general telephone service clearly in the public interest, and should be encouraged rather than denied.

*In Re Application of Commonwealth Telephone Co.,* No. 97564 (Pa. PUC, July 9, 1974).

Mobilfone unsuccessfully appealed the PUC's decision through Pennsylvania's appellate courts, and also took an active role as a protestant before the Federal Communications Commission in Commonwealth's subsequent successful application for the necessary construction permit to operate the signaling facility. *See In Re Commonwealth Telephone Co.,* No. 21513–CD–P–75 (FCC, May 24, 1976); *id.,* (FCC, September 20, 1976). Mobilfone filed its complaint in the federal district court on June 2, 1976, seeking a permanent injunction against future competition from Commonwealth.

## II.

The *Parker* rule holds that certain state action is immune from the Sherman Act's proscriptions. In *Parker,* a raisin producer-packer brought suit against California officials to challenge a state program designed to restrict competition among raisin growers and thereby to maintain prices in the raisin market. The Supreme Court determined that the state "as sovereign, [had] imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." 317 U.S. at 352, 63 S.Ct. at 314. *See also Olsen v. Smith,* 195 U.S. 332, 344–45, 25 S.Ct. 52, 49 L.Ed. 224 (1904).

We do not write on an empty slate in deciding the applicability of *Parker* to the facts before us. Three recent decisions of the Supreme Court provide guidance and direction: *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); and *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

### A.

Mobilfone relies primarily upon *Cantor,* which also involved a utility company. There, the company was a sole supplier of electricity in southeast Michigan, and had a practice of distributing light bulbs to its customers. The distribution program had been approved as part of the company's rate structure by the state Public Service Commission. In holding that *Parker* did not apply as a defense in an antitrust challenge to the distribution program, the Court determined that the mere reception and approval of a state tariff was not sufficient to invoke the *Parker* rule when the challenged activity (distribution of light bulbs) was unrelated to any articulated state objective. The obvious and presumably valid state interest—the regulation of electric utilities—would not be affected by a negative disposition regarding the light bulb distribution program, and, indeed, the Court determined the specific activity of light bulb distribution to be "unregulated" by the state. 428 U.S. at 584, 96 S.Ct. 3110.

*Goldfarb,* another case in which immunity was not found to exist, involved a Sherman Act challenge to a state bar association's fee schedule. In arguing for the application of *Parker,* the state and county bars stressed that, through its legislature, Virginia had authorized its highest court to regulate the practice of law, and that the court had adopted ethical codes which dealt in part with fees. The *Goldfarb* Court noted that "far from exercising state power to authorize binding price fixing, [the Supreme Court of Appeals of Virginia] explicitly directed lawyers not 'to be controlled' by fee schedules." 421 U.S. at 789, 95 S.Ct. at 2014. Rejecting the bar association's reliance on *Parker,* the Court stated: "It is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be com-

pelled by direction of the State acting as a sovereign." *Id.* at 791, 95 S.Ct. at 2015.

In *Bates,* however, "*Parker*-type immunity" *was* found to apply in a challenge to a state court's ban on lawyer advertising. In holding the *Parker* rule applicable, the Supreme Court thoroughly analyzed the *Cantor* and *Goldfarb* cases:

> [T]he Court emphasized in *Cantor* that the State had no independent regulatory interest in the market for light bulbs. 428 U.S., at 584–585, 96 S.Ct. [3110], at 3114; *id.,* at 604–605, 612–614, 96 S.Ct. [3110], at 3123–3124, 3127–3128 (concurring opinions). There was no suggestion that the bulb program was justified by flaws in the competitive market or was a response to health or safety concerns. And an exemption for the program was not essential to the State's regulation of electric utilities. In contrast, the regulation of the activities of the bar is at the core of the State's power to protect the public. Indeed, this Court in *Goldfarb* acknowledged that "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" 421 U.S., at 792, 95 S.Ct. [2004], at 2016. See *Cohen v. Hurley,* 366 U.S. 117, 123–124, 81 S.Ct. 954, 958, 6 L.Ed.2d 156 (1961). More specifically, controls over solicitation and advertising by attorneys have long been subject to the State's oversight. Federal interference with a State's traditional regulation of a profession is entirely unlike the intrusion the Court sanction[ed] in *Cantor.*
>
> Finally, the light-bulb program in *Cantor* was instigated by the utility with only the acquiescence of the state regulatory commission. The State's incorporation of the program into the tariff reflected its conclusion that the utility was authorized to employ the practice if it so desired. See 428 U.S., at 594, and n. 31, 96 S.Ct. [3110], at 3118. The situation now before us is entirely different. The disciplinary rules reflect a clear articulation of the State's policy with regard to professional behavior. Moreover, as the instant case shows, the rules are subject to pointed re-examination by the policy maker—the Arizona Supreme Court—in enforcement proceedings. Our concern that federal policy is being unnecessarily and inappropriately subordinated to state policy is reduced in such a situation; we deem it significant that the state policy is so clearly and affirmatively expressed and that the State's supervision is so active.

*Bates v. State Bar of Arizona, supra,* 433 U.S. at 361, 97 S.Ct. at 2697 (footnotes omitted).

■ In light of this guidance, we perceive *Cantor, Goldfarb* and *Bates* to teach that in order for the *Parker* rule to apply, the defendant must show that the state has an independent regulatory interest in the subject matter of the antitrust controversy; that there exists a clear and affirmative articulation of the state's policy with regard to that interest; and that the state supervision is active.

### B.

■ Mobilfone urges strenuously that its appeal may be distinguished from the foregoing cases on the basis that its complaint was directed solely to a private defendant and made no claim of antitrust violation by a state. A fair reading of the cases indicates that four present justices of the Supreme Court—not a majority—would restrict application of the *Parker* rule to suits against public officials, *see Cantor, supra,* 428 U.S. at 585–592, 603–05, 96 S.Ct. 3110; *Bates, supra,* 433 U.S. at 361 n.13, 97 S.Ct. 2691, but that the current teaching of the Supreme Court is that state officer status *vel non* of the defendants is only a factor in considering the application of *Parker,* not the controlling determination. As noted by Chief Justice Burger in his concurrence in *Cantor,* "[i]n interpreting *Parker,* the Court has heretofore focused on the challenged *activity,* not upon the identity of the *parties* to the suit. 'The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act

was not meant to proscribe is whether the *activity* is required by the State acting as sovereign.'" 428 U.S. at 604, 96 S.Ct. at 3123, *quoting Goldfarb, supra,* 421 U.S. at 790, 95 S.Ct. 2004.

### III.

■ The central focus of our analysis, then, must be an inquiry into Pennsylvania's regulatory interest in radio-telephone paging: the nature and quantum of that interest, as well as the extent to which the state has expressed and implemented it.

### A.

In *In Re Mervos,* 41 Pa. P.U.C. 422 (1964), the PUC declared that one-way radio-telephone paging is a function of a public utility within the meaning of the Pennsylvania Public Utility law, 66 Pa.Stat.Anno. § 1102(17)(f), as originally enacted in 1937, and that its purpose in asserting jurisdiction over this service was to guarantee adequate development of a new service and to permit "a reasonable measure of competition" between qualified carriers:

> We have no doubt that important segments of the public will come to regard service of this kind as essential to the conduct of their lives and businesses, and that it cannot in its intrastate and nontechnical aspects be left to develop on a haphazard basis.
>
> .    .    .    .    .
>
> [W]e think that a reasonable measure of competition between qualified entrepreneurs in this fledgling industry is salutary and should be encouraged.

41 Pa. P.U.C. at 432, 438.

In 1976, the state legislature amended the Pennsylvania Public Utility Code to reflect the same determination:

> (17) "Public Utility" means persons or corporations now or hereafter owning or operating in this Commonwealth equipment, or facilities for:
>
> (f) Conveying or transmitting messages or communications by telephone or telegraph or domestic public land mobile radio service including, but not limited to,

point-to-point microwave radio service for the public for compensation;  .  .  .  .

66 Pa.Stat.Anno. § 1102(17)(f) (Purdon's Supp. 1977).

Thus, through both its Public Utility Commission and its legislature, Pennsylvania has clearly and affirmatively expressed a state policy that radio paging is a public utility and, moreover, that it is a "fledgling industry" that should be regulated with "a reasonable measure of competition." However, we must also examine the extent of Pennsylvania's supervision of this activity.

### B.

To engage in radio-telephone paging service in Pennsylvania, one must apply to the PUC for a certificate of public convenience, 66 Pa.Stat.Anno. § 1121, which sets forth the territory to be served. The service may not thereafter be abandoned without PUC approval. § 1122. The application procedure is a detailed one, and the Commission may impose conditions it deems "just and reasonable" after making "such inquiries, physical examinations, valuations, and investigations" as are necessary in reaching its determination. § 1123.

The rates imposed for the service must be "just and reasonable", § 1141, and must be set forth in tariffs open to public inspection under rules and regulations prescribed by the Commission. § 1142. The utility must adhere to its tariff. § 1143. Moreover, no tariff change may be made except after a 60-day public notice, § 1148(a), and the Commission may "either upon complaint or upon its own motion,  .  .  . enter upon a hearing concerning the lawfulness of such rate", § 1148(b), with the Commission having the ultimate power and authority to "determine the just and reasonable rate to be charged or applied". § 1148(c). Further, if, upon complaint or upon its own motion, the Commission finds that the existing rates are "unjust, unreasonable, or in anywise in violation of any provision of law, the commission shall determine the just and reasonable rates," § 1149, including temporary rates. § 1150. The burden of proving

that the rate is just and reasonable is upon the utility. § 1152.

Pennsylvania requires that the service "furnish and maintain adequate, efficient, safe, and reasonable service and facilities" that are "reasonably continuous and without unreasonable interruptions or delay", § 1171, and authorizes the Commission to ensure that such services and facilities meet these standards, upon its own motion or upon complaint. § 1183. Finally, state law prohibits discrimination in service, specifically forbidding "any unreasonable preference or advantage" to any user, or subjecting a user to "any unreasonable prejudice or disadvantage." § 1172.

We note that in making its determination on Commonwealth's application, the Pennsylvania Public Utility Commission held hearings, received briefs, and entertained oral argument. It specifically addressed Mobilfone's contention that Commonwealth's proposed service would create an "undesirable competitive situation" by stating its policy determination that "[t]he Commission is not convinced that a reasonable measure of competition between radio-telephone common carriers is undesirable." *In Re Application of Commonwealth Telephone Co.,* No. 97564 (Pa. PUC, July 9, 1974).

Hearkening to the teachings of the Supreme Court in *Bates, supra,* we are convinced that "the regulation of the [challenged] activities of the bar is at the core of the State's power to protect the public", and that it is of the type that has "long been subject to the State's oversight." 433 U.S. at 361–62, 97 S.Ct. at 2697–98. We therefore conclude that radio-telephone paging service is subject to a state policy of regulation clearly and affirmatively expressed and that the state's supervision is comprehensively active. Viewed from the standard we articulated in *Duke & Co. v. Foerster,* 521 F.2d 1277, 1280 (3d Cir. 1975), we also can easily conclude that the intent of Pennsylvania to regulate competition in radio-telephone paging has been amply "demonstrated by explicit language in state statutes, or may be inferred from the nature of the powers and duties given to a particular government entity", here the Public Utility Commission.

## IV.

The power of the state to regulate competition among public utilities has been recognized by the Supreme Court since 1876. *See Munn v. Illinois,* 94 U.S. 113, 125, 24 L.Ed. 77 (1876). We believe that recognition of this power is a legitimate factor for determining immunity from federal antitrust laws, and that most antitrust challenges in the public utility context will necessarily involve some consideration of the *Parker* rule's applicability. *See e. g., Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1134 (5th Cir. 1975); *Business Aides, Inc. v. Chesapeake and Potomac Telephone Co.,* 480 F.2d 754 (4th Cir. 1973); *Gas Light Co. v. Georgia Power Co.,* 440 F.2d 1135 (5th Cir. 1971), *cert. denied,* 404 U.S. 1062, 92 S.Ct. 732, 30 L.Ed.2d 750 (1972); *Washington Gas Light Co. v. Virginia Electric and Power Co.,* 438 F.2d 248 (4th Cir. 1971).

Having already determined that the *Parker* rule applies here, however, we note an even more basic deficiency in Mobilfone's objection to Commonwealth's application. Unlike the factual predicate of *Cantor,* in which the challenged activity was one discrete portion of a public utility's operation, Mobilfone challenges here the very entry of Commonwealth into the radio-telephone paging business. It is thus a challenge to (1) the very right of Commonwealth to conduct a business in competition with it, and (2) the power of the Pennsylvania PUC to make a determination regarding competitive effect.

Preliminarily, we observe the anomaly of Mobilfone alleging a potential monopoly when, at the time of filing the complaint, it was the sole facility providing radio-telephone paging service, and was, therefore, a monopoly itself. Notwithstanding its own status, it sought the protection of the federal antitrust laws to prevent Commonwealth from becoming its competitor. Reduced to this light, Mobilfone's argument is that a federal court should permanently enjoin

Commonwealth from even the possibility of enjoying a position exclusively held by Mobilfone.

Quite apart from questions of its internal logic, Mobilfone's argument gives rise to two irrefutable responses. First, even if radio-telephone paging were not an activity that is comprehensively regulated by Pennsylvania public utility statutes and regulations, the anti-monopoly argument, as advanced, would be premature. At the time Mobilfone sought an injunction in the district court, Commonwealth had not yet entered the field, had not filed a tariff, and had not yet commenced the radio-telephone paging service. As the Federal Communication Commission observed in rejecting Mobilfone's request that the FCC conduct an inquiry into a possible monopoly: "We are of the opinion that this is not the proper time . . . to initiate the inquiry . . . . The rates attacked by Mobilfone are merely *proposed* rates and are not yet in effect. . . . ." *In Re Commonwealth Telephone Co.,* No. 21513–CD–P. 75 (FCC, September 20, 1976).

But more important for our purposes is the reality that Commonwealth's activity *is* subject to the Pennsylvania public utility laws. And under Pennsylvania law, the PUC considers the competition factor—as it did here—as well as the need for the service and the fitness of the applicant. *See, e. g., Chemical Leaman Tank Lines, Inc. v. Pennsylvania Public Utility Commission,* 201 Pa. Super. 196, 204–09, 191 A.2d 876, 880–82 (1963). Under Pennsylvania public utility law, as is the case of most state and federal utility regulatory practices, the public service or utility commission may decide, in the exercise of its discretion, to reject competition altogether:

> It is a general principle of utility law that competition will not be permitted among public utilities to such an extent as would defeat the purpose of the grant of the franchise and injure the public interest. At the same time, there is a certain latitude granted the administrative agency as to the extent of competition among franchised utilities which will best serve the public interest.

*Yellow Cab Co. v. Pennsylvania Public Utility Commission,* 161 Pa.Super. 41, 51, 54 A.2d 301, 306 (1947). If the Pennsylvania PUC may *restrict* competition, then this case, in which the state has decided to *allow* competition, albeit "a reasonable measure of competition", is an *a fortiori* exercise of power under state law.

## V.

Accordingly, we are persuaded that Pennsylvania has an independent regulatory interest in radio-telephone paging services; that the state's public utility law, which imposes direct supervision by the PUC over this activity, reflects a clear articulation of the state's policy with regard to its traditional regulatory interest; that the state's policy here is clearly and affirmatively expressed both by statute and in the opinion by the PUC; and that the state supervision of the challenged activity is comprehensive and active. We therefore conclude that there is ample justification for subordinating the federal antitrust policy to the state policy of regulating competition in the radio-telephone paging field.

The judgment of the district court will be affirmed.

CHRISTENSEN, Senior District Judge, dissenting:

Believing that the case should not have been decided on summary judgment, I respectfully dissent.

Judge Aldisert's able statement of the case should be supplemented by the observation that all of the allegations of Mobilfone's Amended Complaint stood unchallenged before the district court at the time the action was dismissed. Among those allegations were that "Commonwealth's sales and advertising facilities for marketing a one-way service in the greater Wilkes-Barre area is much greater than all of the companies now rendering that service and any potential new entrants combined. . . Defendants intend to establish their one-way signaling service in the greater Wilkes-Barre area at anti-competitive, non-com-

**148**

pensatory rates with the necessary result that plaintiff's one-way signaling competition and that of all other radio common carriers will be eliminated in that area. . . . If Plaintiff is forced out of its signaling service business, it will be unable to economically remain in the mobil[e] phone service business. . . . The defendants are threatening to employ their monopoly power in the telephone service business to monopolize the one-way signaling business in the greater Wilkes-Barre area . . . . [and that] Plaintiff's one-way signaling business and mobil[e] phone business will suffer serious and irreparable injury unless the defendants are enjoined from committing the foregoing threatened violation of the anti-trust laws."

Summary judgment should be granted only when the pleadings, depositions, affidavits, and admissions filed in the case show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.Rules Civ.Proc. Particularly in complex antitrust litigation summary judgment should be sparingly used since "[t]rial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'evenhanded justice' ". *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). In this case there were no affidavits or depositions tending to pierce the allegations of the complaint. During oral argument counsel for Commonwealth indicated its position here as being that no matter what anti-competitive pressures were used by it against competitors and irrespective of how effective they might prove in eliminating competition, they should be immune from the reach of the antitrust laws.

The majority opinion perceives an anomaly in Mobilfone's alleging a potential monopoly when, at the time of filing the complaint, it was "the sole facility providing radio-telephone paging service, and was, therefore, a monopoly itself" and "[n]otwithstanding its own status, it sought the protection of the federal antitrust laws to prevent Commonwealth from becoming its competitor."

Be this as it may, it is readily apparent that the gist of Mobilfone's claim in the district court was that Commonwealth intended to and would unless restrained unlawfully use its monopoly power to suppress competitors. While the prayer of its complaint included request for an injunction barring Commonwealth's entry into the market, the issue before us is quite different—whether as an authorized entrant into the market Commonwealth has complete immunity to utilize its admittedly monopolistic power in related areas to suppress and eliminate competition in the radio-telephone paging service market in which it has not been legally granted a monopoly.

The state PUC did not address itself to the question before us, nor did the FCC. Commonwealth's entry into the market has been approved at its own request and without compulsion by the state. In that process the latter has indicated no intention of establishing a monopoly of the radio-telephone paging market nor, indeed, of authorizing the achievement of any such monopoly through anti-competitive techniques and strategies of participants in the market.

This case in its present posture does not justify application of the *Parker* exception. More recent decisions of the Supreme Court and the Third Circuit raise further questions concerning the propriety of extending that doctrine to justify summary judgment under the circumstances of the present case. *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Duke & Company, Inc. v. Foerster,* 521 F.2d 1277 (3d Cir. 1975). The latter decision declined to give a broad reading to *Parker* and in other respects presaged the holding of *Cantor.*

As in *Duke,* reversal of summary judgment seems appropriate in the present case. The resolution of the controlling issue of law might have been close or difficult even after the facts were developed and refined. It seems particularly unwise at this stage to lay down blanket immunity with undifferentiated strokes in the face of the uncontro-

verted allegations of the complaint. Before doing so I think that at least we should have permitted the development of a factual structure upon the basis of which to rule. Perhaps in that process the real problem would emerge as one of primary jurisdiction rather than antitrust immunity. See *Industrial Commun. Sys. Inc. v. Pacific Tel. & Tel. Co.,* 505 F.2d 152 (9th Cir. 1974).

Accordingly, I would reverse the summary judgment and remand the case for further proceedings.