**BOROUGH OF ELLWOOD CITY, PENNSYLVANIA, Borough of Grove City, Pennsylvania, Municipal Corporations, Plaintiffs,**

v.

**PENNSYLVANIA POWER COMPANY, a Pennsylvania Corporation, Defendant.**

Civ. A. No. 77–1145.

United States District Court,
W. D. Pennsylvania.

Jan. 4, 1979.

Charles F. Wheatley, Jr., Wheatley & Miller, Washington, D.C., Nick A. Frisk, Jr., Ellwood City, Pa., Herman M. Rodgers, Borough Sol., Sharon, Pa., Marvin A. Luxenburg, Keller, Luxenburg & Garbett, Ellwood City, Pa., for plaintiffs.

Terence H. Benbow, Winthrop, Stimson, Putman & Roberts, New York City, Harold R. Schmidt, Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., for defendant.

## OPINION

McCUNE, District Judge.

Plaintiffs, the Boroughs of Ellwood City and Grove City, have brought this civil antitrust action against defendant, the Pennsylvania Power Company (Penn Power), alleging violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Clayton Act, 15 U.S.C. § 12(a), by Penn Power, and seeking injunctive and declaratory relief in addition to treble damages, as provided in the Sherman and Clayton Acts. Plaintiffs both purchase power from Penn Power and sell power to retail customers in competition with Penn

Power. The practices of which plaintiffs principally complain involve the setting of wholesale charges to plaintiffs at a level which impedes plaintiffs' ability to compete with defendant in the retail market. Plaintiffs also contend, as miscellaneous claims, (a) that defendant has refused to transport, or "wheel" power to plaintiffs from other sources, effectively precluding plaintiffs from obtaining suppliers of power other than Penn Power; (b) that Penn Power has refused to provide services which would allow plaintiffs to obtain large commercial customers; and (c) that Penn Power has engaged in ratemaking and service policies which are intended to lessen plaintiffs' ability to compete with Penn Power in the retail market. In response to plaintiffs' wholesale rate claim, defendant has moved to dismiss for lack of jurisdiction due to the purported exclusive jurisdiction of the Federal Energy Regulatory Commission (FERC)[1] over the claim asserted. In the event that this motion is denied, defendant has moved, in the alternative, for a stay of this proceeding pending the determination by the FERC of issues raised in this suit concurrently raised in proceedings before the FERC. Penn Power moves, pursuant to Rule (12)(b)(6) of the Federal Rules of Civil Procedure, for dismissal of all of plaintiffs' miscellaneous claims for failure to state a cause of action.

These motions arise 10 months subsequent to the filing of the complaint. Despite the lengthy period since discovery was invoked, it is contemplated that the parties have only begun the process of discovery. It is clear, however, at this time that this court has jurisdiction over plaintiffs' claims. Plaintiffs' rate claims are presently being considered by the FERC, and a stay of these claims pending the FERC determination is justified to avoid duplication of effort. All of plaintiffs' miscellaneous claims are not at this time ripe for summary judgment. The miscellaneous claims which are not disposed of here, are not subject to stay and discovery may continue insofar as it is relevant to these claims and not matters before the FERC.

*Factual Background and Plaintiffs' Claims*

The electric power industry is comprised of companies engaged in three distinct functions; the generation of power, the transmission of very high voltages (bulk power) to distribution points, and distribution of power to consumers at stepped down voltages. The generation of electric power, and, to a degree, the transmission of electric power, are subject to substantial economies of scale. Those companies engaged in the generation function thus tend to be large and frequently are vertically integrated. To take even greater advantage of economies of scale, large companies frequently join with other large companies to form even larger "power pools" which protect against cyclic demand and allow each company to reduce its share of excess capacity. Penn Power is such a large company. Serving a large portion of Western Pennsylvania, Penn Power is engaged in the generation, transmission and distribution of power. Penn Power is a wholly owned subsidiary of Ohio Edison Company. Along with Ohio Edison, the Duquesne Light Company, Toledo Edison Company and Cleveland Electric Illuminating Company, Penn Power is a member of a large power pool, the Central Area Power Coordination Group (CAPCO). Through CAPCO, these firms are able to take advantage of the economies of scale available in the generation and transmission of power.

The distribution of power, unlike its generation, is not subject to substantial economies of scale. Distribution constitutes a natural monopoly, since the duplication of distribution facilities is prohibitively expensive in view of the potential waste involved. As a result, numerous small distribution companies serving a limited area purchase bulk power profitably from large generation companies for resale to industrial, commercial, and residential customers. Often,

1. On October 1, 1977, pursuant to the provision of the Department of Energy Organization Act, P.L. 95–91, 91 Stat. 565 (August 4, 1977) and Executive Order No. 12009, 42 Fed.Reg. 46267 (September 15, 1977), the Federal Power Commission ceased to exist and its functions and responsibilities were transferred to the Secretary of Energy and the FERC.

these distribution companies are municipal corporations serving customers within their municipal boundaries. Plaintiffs are such companies. Both are municipalities; both are involved only in the distribution of power; and both purchase power for resale from Penn Power.

Not only does Penn Power sell power to plaintiffs at wholesale rates, but it is also engaged in the retail distribution of power to customers in the area surrounding plaintiffs' service area. Plaintiffs allege, insofar as competition is possible in the distribution function, Penn Power and plaintiffs compete. For practical purposes, competition between Penn Power and plaintiffs can be seen most strongly in the service of industrial and commercial customers having the option to locate in either the service area of Penn Power or that of plaintiffs. These customers do have a choice of suppliers when making their initial decision to locate their operations. If the retail rates of plaintiffs and Penn Power differ, the location choice of the potential customer can be affected by the differential. Plaintiffs and Penn Power also compete, at least theoretically and on a long term basis, for service areas. If plaintiffs were to become unable to serve their customers profitably, Penn Power would logically be in the best position to assume plaintiffs' present service. The eventual assumption of plaintiffs' service by Penn Power is subject to many indeterminable variables, but it is possible. Insofar as it is possible, the possibility of the assumption of plaintiffs' service area by Penn Power also constitutes a form of competition.

Plaintiffs must deal with Penn Power for their supply of bulk power at wholesale rates. Because plaintiffs' systems are surrounded by Penn Power's service area, any power which could be acquired by plaintiffs would, of necessity, be generated by Penn Power or transmitted to plaintiffs through Penn Power's transmission facilities. It is the position of the plaintiffs that Penn Power thus has the ability to dictate the profitability of plaintiff's operations, theoretically to the point of destroying, completely, plaintiffs' ability to operate profitably, subject only to state and federal regulation and market constraints. Penn Power possesses this power while concurrently competing with plaintiffs in the retail market.

Plaintiffs contend that Penn Power is using its dominant position to their detriment. Plaintiffs' complaint (as stated in the introduction to this opinion) indicates three general types of practices which they argue are violative of the antitrust laws. The most significant complaints relate to the wholesale rates which Penn Power has filed with the FERC which limit plaintiffs' profitability in light of the retail tariffs in effect. These rates are presently being considered by the FERC and plaintiffs have intervened in proceedings before the FERC regarding these rates. Plaintiffs' argument, both here and before the FERC, is that Penn Power's wholesale rates create an impermissible price squeeze in violation of the antitrust laws. See *U. S. v. Aluminum Co. of America,* 148 F.2d 416 (2nd Cir. 1945).

Included in the miscellaneous claims, plaintiffs complain that Penn Power has refused to deal with them when special technical services (69 kv and two point delivery) were requested to enable plaintiffs to serve industrial customers. Plaintiffs also seek access to the CAPCO power pool, which they contend Penn Power, along with other members of CAPCO, have conspired to block. Plaintiffs complain that Penn Power has adopted a policy of refusing to wheel power purchased from other sources to plaintiffs through their transmission facilities. These practices, plaintiffs argue, constitute refusals to deal in violation of the antitrust laws.

Plaintiffs finally contend (as part of their miscellaneous claims) that Penn Power has timed its submission of rates with the intention of damaging plaintiffs' ability to compete. The rate changes complained of allegedly made equipment purchased by plaintiffs unprofitable to operate. Plaintiffs also contend that Penn Power has failed to give them quantity discounts given to other similar wholesale customers.

### Subject Matter Jurisdiction over Rate Claim

Penn Power has moved to dismiss the rate related price squeeze counts in plaintiffs' complaint, arguing that ratemaking on both the wholesale and retail levels is so regulated by the state and federal governments as to create immunity from antitrust review of rate decisions. Penn Power relies on the rule of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) in contending that any antitrust violations based on retail rates as set by the Pennsylvania Public Utility Commission (PUC) are immune from antitrust review. Penn Power also argues that wholesale rates set by the FERC cannot create liability due to the rule of *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), the federal correlate of the *Parker* rule. Finally, Penn Power inferentially argues that the combined effect of federal and state regulation creates antitrust immunity. Each of these arguments must be separately considered.

Insofar as state regulation is urged as a basis of antitrust immunity, this action is controlled by the holding of *Cantor v. Detroit Edison,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). *Cantor* was a private antitrust suit brought as a result of actions of Detroit Edison, a public utility, pursuant to a binding tariff approved by the state regulatory commission. Detroit Edison provided customers with lightbulbs in an amount determined by the power usage of the customer. No charge for the bulbs, beyond that of the rate charged for power usage, was made. The program was designed to stimulate the use of power by Detroit Edison customers. The plaintiff, a retail distributor of lightbulbs, brought an antitrust action against Detroit Edison, alleging the lightbulb program was a tying arrangement in violation of the antitrust laws.

The bulb distribution plan was submitted as part of a comprehensive tariff filed with and approved by the state regulatory commission. The tariff could not be varied by the utility while it remained in effect. The utility could, however, file a new tariff at any time, dropping the lightbulb program.

Such a tariff would be effective upon approval of the commission. The issue presented was whether such a tariff would create antitrust immunity as an act under compulsion of the sovereign. The Court held it did not.

Justice Stevens, joined by a plurality of the Court, wrote the opinion of the Court, an opinion in which Chief Justice Burger concurred in two significant parts. Justice Brennan concurred in the result, but not the reasoning of the plurality.

Justice Stevens discusses the holding of *Parker* in the first section of the plurality opinion. Based on the history and careful language of *Parker,* Justice Stevens concludes that *Parker* applies only to acts of the state or its agents. Since *Cantor* does not involve actions of the state alone, *Parker* does not control. This holding was not joined by the majority of the Court, however. As a result, the scope of *Parker* is unclear. See Burger Concurrence, 428 U.S. 604, 96 S.Ct. 3110.

Part two of the plurality opinion is joined by Chief Justice Burger. Because of the concurrence of the Chief Justice, this section (and section four) contains the critical majority holding of the Court.

The question considered in part two of the decision is whether "private conduct required by state law is exempt from the Sherman Act." *Parker,* itself, is not considered. The Court turns rather to other precedent in attempting to define a rule controlling the question posed.

The Court initially accepted the contention that it would be fundamentally unfair to impose liability upon individuals acting entirely under compulsion by the state. Most state compulsion is, however, a mixture of state and private decision-making. A fairness standard, therefore, beyond being unhelpful in most cases, rarely would apply, and was thus rejected.

*Amici Curiae* argued that antitrust concepts are fundamentally inconsistent with the regulation of public utilities, which is usually on a "public interest" basis, thus regulation required immunization. The

Court rejected this argument as well, based on three grounds. First, the mere co-application of state and antitrust regulation in an industry does not imply inconsistency between these standards. Second, assuming inconsistency, it is not necessary that when inconsistency arises, antitrust review should be subordinated to state interests. Third, even when exemption is found, that exemption must be limited to policies and activities in the regulated area only. In *Cantor,* given the fact that the lightbulb market was not a regulated market, exemption was not justified.

Turning to precedent concerning implied exemption from the antitrust laws by federal regulatory legislation, the Court held that exemption would be found only if "exemption was necessary in order to make the regulatory act work 'and even then to the minimum extent necessary.'" *Id.,* at 597, 96 S.Ct. at 3121, quoting *Otter Tail Power Company v. U. S.,* 410 U.S. 366, 389, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

Under the holding of *Cantor,* it was clear that a lightbulb distribution program was not necessary to the regulation of electric power sales.

█ We conclude, based on the *Cantor* holding, that state regulation of retail rates does not immunize the wholesale rates when, as here, a price squeeze is alleged and wholesale rates are beyond state jurisdiction.

The Pennsylvania Public Utility Code, 66 P.S. § 1101 *et seq.,* requires all tariffs to be approved by the PUC prior to becoming effective. 66 P.S. § 1142. The rates approved must be just and reasonable. 66 P.S. § 1141. There is nothing in this regulatory scheme which would be inconsistent with the prohibition of a price squeeze such as that asserted by plaintiffs. In fact, the wholesale rates controlled by the FERC are not controlled by the PUC. 66 P.S. § 1142. The full mechanism of price squeeze, therefore, the control of both retail and wholesale rates, is not within PUC control. Applying antitrust review to the differential between these rates is thus not inconsistent with the state regulatory scheme; the subject of the claims falls outside the regulatory regime. State regulation does not provide grounds for an implied exemption to the antitrust laws in this instance. *Accord, City of Mishawaka v. Indiana & Michigan Electric Company,* 560 F.2d 1314 (7th Cir. 1977), and *City of Shakopee v. Northern States Power Co.,* Civ. No. 4–75–591 (D.Minn.1976).

Penn Power relies heavily upon a recent opinion of the Court of Appeals for the Third Circuit, *Mobilfone of Northeastern Pennsylvania v. Commonwealth Telephone Co.,* 571 F.2d 141 (3d Cir. 1978), in arguing against application of *Cantor.* This reliance is misplaced. In *Mobilfone* the Court of Appeals found the *Parker* exemption to be justified due to the pervasive regulation of the defendant telephone system pursuant to the Pennsylvania Public Utility Code, the same code under which Penn Power is regulated. The activities challenged in *Mobilfone* differ significantly, however, from those questioned in this action.

In *Mobilfone,* a radio-telephone paging company sought to bar Commonwealth Telephone Company from entering the radio-telephone paging market, arguing that entrance by Commonwealth constituted a monopolization of the market violative of the antitrust laws. The action brought into question the basic power of the state to admit a competitor into a regulated market; this challenge cut to the heart of the state interest in regulating a market in which it had determined competition not to be in the public interest. The court determined that three requirements needed to be fulfilled for *Parker* to apply:

"... the defendant must show that the state has an independent regulatory interest in the subject matter of the antitrust controversy; that there exists a clear and affirmative articulation of the state's policy with regard to that interest; and that the state supervision is active."

*Id.,* at 144. All of these requirements were found to be satisfied, due to the fact that the challenged activity was operating in the radio paging market. Since the market was actively and pervasively regulated, and the state had expressed an interest in limit-

ing competition through regulation, *Parker* immunity was present. In this action, the challenged activity falls beyond PUC regulation. Since wholesale rates are not within PUC purview, at least the third element of the *Mobilfone* holding, active supervision, is necessarily absent. *Mobilfone,* therefore, supports plaintiffs' position and not that of Penn Power. *Parker* immunity based on state regulation is absent.

 Federal regulation provides no exemption either. Penn Power argues that since the FERC has jurisdiction over wholesale rates and can consider the price squeeze alleged in the setting of these rates, there is an implied exemption from District Court jurisdiction over price squeeze antitrust claims.

Penn Power bases its argument upon *FPC v. Conway Corp.,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). The question presented by *Conway,* as framed by the Court, was this:

> "When a power company that sells electricity at both wholesale and retail seeks to raise its wholesale rates, does the Federal Power Commission have jurisdiction to consider the allegations of the company's wholesale customers that the proposed wholesale rates, which are within the Commission's jurisdiction, are discriminatory and noncompetitive when considered in relation to the company's retail rates, which are not within the jurisdiction of the Commission?

*Id.,* at 272, 96 S.Ct. at 2001.

The factual background of *Conway* is very similar to the case at hand. Arkansas Power and Light (APL) sought to raise its wholesale rates, filing a revised tariff with the FERC (then the Federal Power Commission). Wholesale customers sought to intervene before the Commission, opposing the rates. Price squeeze allegations similar to those asserted here were made by the customers. The Commission allowed intervention but would not hear argument based on the differential between the wholesale and retail rates, since the retail rates were beyond the jurisdiction of the Commission, being set by the State Commission.

The Supreme Court rejected the position of the Commission. Although the retail rate is not within the jurisdiction of the FERC, there is adequate variance in the zone within which wholesale rates may be set as to enable the Commission to set a rate which would ameliorate the condition of wholesale customers subject to the price squeeze. "The Commission must arrive at a rate level deemed by it to be just and reasonable, but in so doing, it must consider the tendered allegations that the proposed rates are discriminatory and anti-competitive in effect." *Id.,* at 279, 96 S.Ct. at 2004.

Penn Power maintains that since the FERC has jurisdiction to hear the arguments raised by plaintiffs in this action, the FERC has exclusive jurisdiction over those antitrust claims.

An implied repeal of the antitrust laws is not so easily established, however. *Conway* is not a jurisdictional case.

 Further, the mere fact that FERC may consider arguments based on antitrust concepts does not preclude later antitrust review. There is no certainty that use of the limited powers of the FERC can fully remedy an antitrust violation. Mere consideration of a claim does not rise to the level of complete disposition of the underlying violation.

*Conway* does not mandate an exemption from antitrust review under *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1974). The *Gordon* rule does not differ appreciably from that announced in *Cantor.* Exemption results only if there is a clear repugnancy between the regulatory legislation and antitrust review. Justice Douglas, in his concurring opinion writes:

> "The mere existence of a statutory power of review by the SEC over fixed commission rates cannot justify immunizing those rates from antitrust challenges. The antitrust laws are designed to safeguard a strong public interest in free and open competition, and immunity from those laws should properly be implied only when some equivalent mechanism is

functioning to protect that public interest."

*Id.*, at 692, 95 S.Ct. at 2616.

The FERC does not provide an "equivalent mechanism" to protect public interest. The FERC cannot enjoin violation of antitrust law; it cannot revise retail rates or fix wholesale rates beyond the zone of reasonableness;[2] it cannot award damages. District Court jurisdiction is necessary to preserve these remedies.

Given the fact that *Conway* requires the FERC to consider (and by implication, to follow) the antitrust laws, it cannot be said that dual FERC and District Court jurisdiction creates repugnancy. The District Court must, therefore, be found to have jurisdiction to adjudicate plaintiffs' claims.

There is no question that Penn Power is subject to regulation by both state and federal agencies. All rates are reviewed by a regulatory commission. Because, however, no regulatory agency has jurisdiction over the complete rate structure complained of by plaintiffs, it is improper to accord antitrust immunity to the rate related complaints raised here. When the entirety of rate regulation is considered, the significant factors underlying a determination of exemption due to state or federal regulation are not modified. There is no mechanism which accords overall review of ratemaking and its potential anticompetitive effect. There is no indication that overall district court antitrust review of rates (at least with regard to price squeeze allegations) is in any way repugnant to any regulatory scheme. For these reasons, plaintiffs' rate related antitrust allegations are within the subject matter jurisdiction of this court.

*Primary Jurisdiction over Rate Claim*

Penn Power has moved that the rate related aspects of this suit be stayed pending the determination of rate proceedings presently before the FERC concerning the rates plaintiffs allege to establish a price squeeze. Penn Power urges application of the doctrine of primary jurisdiction in the consideration of the stay, and argues as well that a discretionary stay is justified and within the residuary powers of this court. Because the arguments plaintiffs raise in this action must be considered by the FERC, and because the rate determination will be of use in the final adjudication of plaintiffs' claims, we find a stay justified, both as an exercise of the residuary powers of this court in the management of its docket and, alternatively, as an application of primary jurisdiction.

The doctrine of primary jurisdiction, stated simply, allows the referral of issues which are concurrently within the jurisdiction of an administrative agency and raised in an action before a trial court to the administrative agency for prior consideration. Primary jurisdiction does not negate the jurisdiction of the district court; it is a doctrine which allows the district court to avail itself of agency expertise, and to avoid, as much as possible, the disruption of the administrative regime. *C.A.B. v. Modern Air Transport, Inc.*, 179 F.2d 622 (2d Cir. 1950). The doctrine is not so much a clearly delineated set of rules, but rather it is an attempt to introduce flexibility into the problems which arise when the jurisdiction of an administrative agency coincides with that of a court. Insofar as a court should defer on an issue to agency expertise, the doctrine is *pro tanto* exclusive jurisdiction, though the court is not ousted of its overall jurisdiction over the claims as-

---

**2.** Penn Power argues that rates within the zone of reasonableness are *ipso facto* not violative of the antitrust laws, given the mandate of the *Conway* decision. If rates are set below the zone of reasonableness, they are confiscatory and subject to constitutional challenge. See *Bluefield Water Works & Improvement Co. v. Public Service Comm'n of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). Even the district court, therefore, may not have power to set a wholesale rate below the level which the FERC can set the rate. This argument is not inconsistent with a holding of non-immunity since no complete antitrust remedy can be imposed without control of both the retail and wholesale rates. In addition, treble damages cannot be awarded by the FERC. The remedial powers of the district court are, even accepting Penn Power's argument, more extensive than those possessed by the FERC.

serted. Primary jurisdiction is thus, in some sense, cognate to *Parker* immunity in that it embodies a form of administrative pre-emption. The questions presented by primary jurisdiction differ, however, because they focus upon the individual issues considered by the agency and not the over-all jurisdiction of the agency. See *Texas and Pacific Railway Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); *Far East Conference v. U. S.,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); See generally, Jaffe, *Primary Jurisdiction,* 44 Harv.L.Rev. 1037 (1964) and von Mehren, *The Antitrust Laws and Regulated Industries; the Doctrine of Primary Jurisdiction,* 67 Harv.L.Rev. 929 (1954).

The rates which are at question in this action are presently being considered by the FERC at Docket No. ER 77–277. Counsel for Penn Power has indicated that hearings on the reasonableness of rates have begun. Plaintiffs have intervened before the FERC and presently are represented in the rate proceeding. Under the mandate of *Conway, supra,* Part II, the FERC must hear plaintiffs' price squeeze arguments in setting a just and reasonable rate. The issue of whether the rate complained of is violative of the antitrust laws is before the FERC. Issues regarding the reasonableness of rates submitted which will be decided by the FERC bear upon important problems of intent presented by plaintiffs' price squeeze theory. Although these factual issues before the FERC would be of use to this court in the determination of this claim, the actual determination of the legal structure of a price squeeze claim and its presence or absence here must remain in this court. See *supra,* Part II. Further, this court has remedial powers, in particular, injunctive and treble damage relief, which are not held by the FERC. The question presented, therefore, is whether the issues raised by plaintiffs' price squeeze complaint should be deferred to the FERC for determination, even though these issues do not constitute the entire antitrust claim and the FERC may not possess the full panoply of remedial powers which the district court may employ, and which may be required to fully remedy any violation which may be proven.

The inadequacy of agency remedial powers does not preclude the application of primary jurisdiction in an antitrust action. The Court of Appeals for the Third Circuit has rejected this argument as a basis for denial of agency primary jurisdiction. *Laveson v. Trans World Airlines,* 471 F.2d 76 (3d Cir. 1972). The court held that focus upon remedies rather than upon jurisdiction was improper.

"The rationale for applying the primary jurisdiction doctrine does not depend upon the particular kind of relief plaintiffs request. Rather, it rests upon a judicial reluctance to hold practices within the scope of an agency's jurisdiction to be antitrust violations and then to act upon such a holding by granting relief—damages or injunctive—before prior resort to the agency."

471 F.2d 76, 83–84. Remedial issues are properly considered in the determination of subject matter jurisdiction (See Part II, *supra*), not primary jurisdiction. Given the holding in *Laveson,* there is no distinction to be made due to remedial powers between this and other primary jurisdiction precedent. It is proper to turn to the questions normally presented by primary jurisdiction.

Several considerations have been developed to aid in determining the propriety of referral. In *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1972), an action brought in District Court concerning activities which were concurrently within the jurisdiction of the court and the Commodity Exchange Commission, a stay based on primary jurisdiction was granted. The Supreme Court affirmed the decision of the District Court relying

"on three related premises: (1) that it will be essential for the antitrust court to determine whether the Commodity Exchange Act or any of its provisions are 'incompatible with the maintenance of an antitrust action,' (2) that some facets of the dispute . . . are within the statutory jurisdiction of the Commodity

and Exchange Commission; and (3) that the adjudication of that dispute by the Commission promises to be of material aid in resolving the immunity question."

*Id.* at 302, 93 S.Ct. at 580.

The third premise of *Ricci* is practical in thrust. The possibility that the FERC proceeding could aid this court implies an overlap between the inquiry which must be made by the FERC and the court. If an overlap exists, duplication of effort should be avoided. The reasonableness of rates brings into question the relation between the rates filed and the cost of providing service. This question in turn bears upon the findings of purpose and intent which must be considered here. Because *Conway* requires the FERC to consider plaintiffs' claims, the determinations made by the FERC will be focused upon the claims made in this action. Plaintiffs are parties to the FERC proceedings. They will not be prejudiced by an application of primary jurisdiction through exclusion from the agency proceedings. Both the FERC determination and review of rates by this court necessitate involved proceedings covering much the same ground. There is no reason why this ground should be covered twice. Insofar as primary jurisdiction rests on practicality, a stay of this action is clearly justified.[3]

The second premise of *Ricci* is also satisfied by the facts of this case. Price squeeze allegations rest on rates. Rates are within the jurisdiction of the FERC. After *Conway*, it cannot be argued that plaintiffs' claims are not within FERC jurisdiction.

It is more difficult to comply with the first premise of *Ricci*, which requires incompatibility between the Federal Power Act and the antitrust laws. This is because we have found no general incompatibility between regulatory and antitrust review which would require removing subject matter jurisdiction from this court. Despite this holding, however, there is at least a strong argument that a finding by FERC

that a rate was reasonable could be determinative of elements of the antitrust claim. This argument rests not on general incompatibility, but upon issue incompatibility. If the FERC determines Penn Power's rate filing to be reasonable, that finding will illuminate the issue of Penn Power's intent. It will be difficult for this court to determine whether a price squeeze was present without reviewing the cost structure of the submitted rates. This inquiry would lead this court into the heart of a rate-making proceeding, well within the experience of the FERC and beyond the normal expertise of the court. A real possibility that Penn Power could be faced with inconsistent findings as to the reasonableness of the rates exists. This argument satisfies the first premise of *Ricci*. Primary jurisdiction therefore rests in the FERC.[4] Inconsistency should not arise in the conclusions of the FERC and the court.

This holding may appear to be in contradiction to the holding of the Court of Appeals for the Seventh Circuit in *City of Mishawaka v. Indiana & Michigan Electric Co.*, 560 F.2d 1314 (7th Cir. 1977). *Mishawaka* is distinguishable on its underlying facts, however, and we further perceive the reasoning in *Mishawaka* to deviate from the most logical and practical methods of treating issues raised here. In any event, even if *Mishawaka* were to be followed, a discretionary stay (which, in the alternative, we grant) is not precluded by the *Mishawaka* decision.

### *The Motions under Rule 12(b)(6)*

■ Plaintiffs' complaint alleges, at paragraph 10, that Penn Power, in conspiracy with Ohio Edison and the members of CAPCO, violated the antitrust laws in,

"(a) preventing plaintiffs from gaining access to alternative sources of power which impairs the reliability of service of the municipal electric systems, increases

---

**3.** Practicality is the basis for a discretionary stay. The final two premises of *Ricci* indicate, as they apply to this action, the merit of a discretionary stay. On the basis, we hold a discretionary stay to be justified as an alternative to the primary jurisdiction holding.

**4.** It must be emphasized that *Ricci* does not require a finding of immunity before referral, and no such finding has been made here.

their costs and diminishes their ability to compete with the larger investor-owned system;

(b) refusing to deal with the plaintiffs;

(c) agreeing to adopt and adopting a policy of denying access by municipal electric systems to nuclear generating facilities owned jointly and individually by the CAPCO member companies;

(d) further agreeing and adopting a policy of refusing to provide wheeling service to municipal systems."

Penn Power has moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of these claims, because no explicit demand was made of Penn Power for any of these services. Penn Power relies upon answers to interrogatories in making this motion. Because these are "matters outside the pleadings" presented to the court, this motion will be treated as a Motion for Summary Judgment pursuant to Rule 56. Rule 56 requires the motion to be granted "if the pleadings, depositions, answers, to interrogatories, and admissions on file, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56, Federal Rules of Civil Procedure.

Penn Power relies on the answers to two interrogatories:

"*Interrogatory* 1(b) If your answer is other than an unqualified negative,—further state:

"(i) each occasion on which plaintiffs requested access to alternative sources of power from defendant, its parent or any other member of CAPCO.

*Answer:* "

&ast; &ast; &ast; &ast; &ast; &ast;

"(3) The facts, practices and patterns by which the defendant, its parent, Ohio Edison Company, and the CAPCO members divided the territories, effectively precluded municipal electric systems from joining CAPCO or obtaining wheeling, the manner in which the defendant refused to grant power so Grove City could keep its generating system, and the defendant's contracts which made Ellwood City and Grove City full requirements

customers showed the plaintiffs that requesting any other alternative power from the defendant, its parent or other members of CAPCO would be futile.

"The plaintiffs' Complaint alleged:

'10. Defendant has and continues to combine and conspire with its parent, Ohio Edison, and the member companies of CAPCO in violation of §§ 1, and 2 of the Sherman Act by doing other acts the following:

(a) preventing plaintiffs from gaining access to alternative sources of power which impairs the reliability of service of the municipal electric systems, increases their costs and diminishes their ability to compete with the larger investor-owned system;'

"The plaintiffs never alleged that the defendant, its parent or other CAPCO members have directly refused any requests from the plaintiffs for alternative sources of power. While the facts do show that the defendant and CAPCO members have refused to provide the plaintiffs with alternative sources of power, the facts, patterns and practices listed in answer to Interrogatories 1(b), 3(b) and 4(b) go far beyond these refusals of the defendant and CAPCO members in supporting the plaintiffs' allegation that 'Defendant has and continues to combine and conspire with its parent, Ohio Edison, and the member companies of CAPCO in—preventing plaintiffs from gaining access to alternative sources of power.'

"*Interrogatory* 4(b) If your answer is other than an unqualified negative, . . . further state:

"(i) each occasion on which plaintiffs requested wheeling from defendant;

(ii) each occasion on which plaintiffs were denied wheeling by defendant;"

"*Answer:* The above facts, patterns and practices showed the plaintiffs that the policy of Ohio Edison Company and Pennsylvania Power Company is to deny wheeling requests from municipals and cooperatives and that requesting such wheeling would be futile. The plaintiffs do not know of any instance where Ohio

Edison and Pennsylvania Power have wheeled for a cooperative or municipal system."

On the basis of these interrogatories, plaintiffs concede they never specifically requested the services which they contend Penn Power would have refused. Penn Power contends that a specific request must be made and the decision of plaintiffs, however reasonable, that any such request would have been futile, does not satisfy this requirement. We agree.

The rule that a demand must be made before a refusal to deal arises is well established. *Lawlor v. National Screen Service Corp.,* 270 F.2d 146 (3d Cir. 1959), and authority cited therein. Futility alone is inadequate.

"A remark by an agent of one of the defendants, from which one might speculate that a demand had been made, or if not made, would have been futile, cannot fulfill the requirement of affirmative evidence or a clear request or demand by plaintiff. [Citation omitted]." *Hamilton Street Corp. v. Columbia Pictures Corp.,* 244 F.Supp. 193 (E.D.Pa.1965).

Plaintiffs' answers to interrogatories 4b and 1b indicate that the services allegedly refused were never specifically demanded. The assertion that the refusal arose as a result of a general course of conduct and statements made to other municipal utilities does not satisfy the requirement that a demand be made. The Motion for Partial Summary Judgment is therefore granted as to the allegations contained in paragraph 10.

### Miscellaneous Claims and Defenses

■ Penn Power raises several additional defenses to plaintiffs' miscellaneous claims, all of which are without merit. Plaintiffs' miscellaneous claims are ambiguous; however, on the current state of the record, they must stand. The settled rule in this circuit is that summary judgments in antitrust cases rarely should be granted. *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127 (3rd Cir. 1978).

■ Penn Power raises the four year statute of limitations on antitrust claims, 15 U.S.C. § 15b, as a defense to certain of plaintiffs' claims. Although this defense may in fact be available to some of the claims brought by plaintiffs, it is not clear from the record at this juncture which claims are time barred. Those claims which remain, the denial of 69 kv service and two point delivery and restrictive electric resale agreements and monopolization through rate timing, relate to conduct continued beyond four years prior to the filing of the Complaint and are not barred. It is unclear, however, whether plaintiffs seek recovery based upon the same theories for acts occurring prior to the limitations period. These claims are, of course, barred, and this will be considered if and when specifically raised.

■ Penn Power argues that plaintiffs' claims based on the denial of 69 kv service and two point delivery are subject to the exclusive or primary jurisdiction of FERC. The assertion of exclusive jurisdiction is precluded by Part II of this opinion. Primary jurisdiction, on the other hand, may be appropriate at some other juncture. See *MCI Communications v. American Telephone and Telegraph Co.,* 496 F.2d 214 (3rd Cir. 1974). Penn Power has not, however, properly raised this issue. Penn Power has moved for dismissal of these claims for failure to state a cause of action; primary jurisdiction does not go to the question of whether a claim has been stated; rather it is a question of procedure.[7]

Penn Power's further argument, that plaintiffs have made inadequate allegations of damage, and have not alleged a duty on the part of Penn Power to service plaintiffs are not substantiated and thus will not be considered. Penn Power had made no argument for dismissal of paragraph 12 of the Complaint, relating to violations of § 2 of the Sherman Act. These claims remain, therefore.

7. If Penn Power wishes to raise the issue of primary jurisdiction with regard to this claim at a later time, the results of the proceedings before the FERC should be presented for consideration of the question.