## FLEETWAY, Inc., v. PUBLIC SERVICE INTERSTATE TRANSP. CO.

### No. 5186.

Circuit Court of Appeals, Third Circuit.

Aug. 28, 1934.

Louis B. Le Duc, of Camden, N. J., for appellant.

Clifford A. Baldwin, of Camden, N. J., for appellee.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the District Court denying injunctive and other relief prayed for under the provisions of the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15 note) and the Clayton Act (38 Stat. 730) and dismissing the bill of complaint.

The plaintiff, Fleetway, Inc., is or was a transportation company operating 9 busses engaged in carrying passengers for hire from Fairview, an outlying section of the city of Camden, N. J., to the Reyburn plaza, City Hall, Philadelphia, Pa. The defendant is likewise engaged in operating a line of 400 or more busses in Southern New Jersey. Some of these likewise carry passengers for hire through Camden over the Delaware River bridge to the Reyburn plaza.

When the plaintiff began the operation of its busses on September 9, 1932, defend-

ant had been operating its line for a long time. Two of its fare zones concern us here. One, called the first zone, was from Fairview to Ninth street and Kaighn avenue, in the city of Camden, for which it charged a fare of 10 cents a ride, and the other, called the second zone, was from Ninth street and Kaighn avenue to Reyburn plaza, Philadelphia, for which it charged 15 cents a ride. When the plaintiff began its operations in these zones, it charged the same cash fares for a ride, but in the first zone it also sold twelve tickets for $1, or 8⅓ cents a ride instead of 10 cents, as defendant then charged, and in the second zone, from Ninth street and Kaighn avenue, Camden, to Philadelphia, it sold twelve tickets for $1.50, or 12½ cents a ride instead of 15 cents, as then charged by the defendant.

This rate of fare continued until October 7, 1932, when the plaintiff, while maintaining its price of 10 cents and 15 cents a ride in the first and second zones respectively, further reduced its fare for tickets in the first zone. It sold two tickets for 15 cents in the first zone, or 7½ cents a ride instead of 8⅓ cents, and two tickets for 25 cents, or 12½ cents a ride in the second zone. The fare was the same in this zone; the difference being that the passenger was required to purchase only two tickets instead of twelve in order to get the reduced rate.

One month and two days later, on November 9, 1932, defendant met the reduction of the plaintiff by making a greater reduction in tickets; the fares for single rides remaining the same. It sold two tickets for 10 cents, or 5 cents a ride in the first zone instead of 7½ cents charged by the plaintiff; and two tickets for 20 cents, or 10 cents a ride in the second zone instead of 12½ cents as charged by plaintiff.

Two days later, November 11, 1932, plaintiff reduced its cash fare to 5 cents a ride in the first zone and 10 cents a ride in the second zone; thus making its price for cash fares the same as defendant's for tickets. This had the effect of eliminating the necessity of purchasing tickets in order to get the reduced rates.

This situation as to operation continued until the end of the year, December 31, 1932, when the plaintiff went out of business. However, on November 11, 1932, plaintiff filed its bill of complaint against the defendant praying for relief.

The plaintiff alleges that, in addition to the demoralizing and uneconomic rates of fare initiated by the defendant, it began from the day of the operation of plaintiff's line a campaign of destructive competition with plaintiff's busses. As many as 12 of the defendant's busses were assigned to cover the operation of a single bus of plaintiff's.

Defendant's plan, plaintiff alleges, was to start several of its busses immediately ahead of plaintiff's single bus, while others would follow it. The busses that followed would cut in ahead of plaintiff's bus as it approached the curb at street crossings where passengers were waiting and thus secure the passengers or obstruct their passage to plaintiff's bus. These tactics were practiced, it asserts, along the entire route, especially Broadway, Camden, and in Philadelphia; that this so-called "wildcatting" and "bottling" conduct on the part of defendant's employees was practiced day after day and was practiced when the bill of complaint was filed.

Plaintiff further alleged that the drivers of defendant's busses, acting under instructions from the defendant's officers, continuously endeavored to damage and wreck plaintiff's busses by driving or backing into them, especially into the sides of plaintiff's busses, where the motors are located, in order to damage the frames and motors; that numerous accidents have been caused and many persons have been injured thereby; that some of defendant's drivers have been arrested and their licenses suspended.

Plaintiff contends that, under section 2 of the Sherman Anti-Trust Act (15 USCA § 2) and section 2 of the Clayton Act (15 USCA § 13), it is entitled to an injunction restraining defendant from continuing its unlawful and discriminatory practices which tend to monopolize the carriage of passengers in interstate commerce and to destroy competition in the carriage of such passengers.

Sections 1 and 2 of the Sherman Anti-Trust Act provide as follows:

"Section 1. *Trusts, etc., in Restraint of Trade Illegal; Penalty.* Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." (July 2, 1890, c. 647, § 1, USCA title 15, § 1.)

"**§ 2.** *Monopolizing Trade a Misdemeanor; Penalty.* Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor." Id. § 2.

■ Section 1 of that act refers to operations of two or more persons in restraint of trade or commerce among the several states or with foreign nations. Section 2 was intended to supplement section 1. Standard Oil Company v. United States, 221 U. S. 55, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. But any individual person alone may offend against the provisions of section 2 of the act by monopolizing, or attempting to monopolize, trade or commerce among the several states or with foreign nations. United States v. MacAndrews & Forbes Company (C. C.) 149 F. 823; United States v. Standard Oil Company (C. C.) 173 F. 177, 195; United States v. Reading Company (C. C.) 183 F. 427. The pertinent question here is whether or not the acts of the defendant in this case monopolized, or attempted to monopolize, trade or commerce between New Jersey and Pennsylvania.

■ The reduction in fares can in no sense be construed as a monopoly or even an attempt to monopolize any part of trade or commerce. The reduction by the defendant became necessary to hold the normal trade which it had before the plaintiff entered the field. It could not be avoided if the defendant was to meet a situation created by the plaintiff and thrust upon the defendant.

■ The "campaign of destructive competition" of which the plaintiff complains was begun and led by it in an effort to capture the patrons of the defendant. So plaintiff cannot complain that defendant used the methods which plaintiff initiated to meet a condition created by it. This cannot constitute a monopoly or an attempt to monopolize. Plaintiff, because of its more limited means, was defeated in a contest which it instigated. That is all there is to the rate cut question.

Section 2 of the Clayton Act provides that: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities, which commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: Provided, That nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade." Oct. 15, 1914, c. 323, § 2, USCA title 15, § 13.

■ The learned trial judge construed this section to apply to "commodities" and not to transportation of passengers by motor busses. The section prevents discrimination in price between different purchasers of commodities which are sold for use, consumption, or resale within the United States, etc. This clearly refers to a commodity such as merchandise, and has no reference to transportation of passengers by busses, for discrimination in price between purchasers of commodities on account of differences in grade, quality, or quantity or a discrimination which makes only due allowance for difference in the cost of selling or transportation is not prohibited. It would be a strange and strained construction that would apply this language to transportation of passengers by busses.

The plaintiff strenuously argued in the District Court, and argues here, that the word "commodity" may be construed "to cover the service of transporting passengers in interstate commerce."

The case cited by it which is admittedly most apposite is McKinley Telephone Co. v. Cumberland Telephone Co., 152 Wis. 359, 140 N. W. 38, 40.

The statute there involved provided: "Any corporation organized under the laws of this state which shall enter into any combination, conspiracy, trust, pool, agreement or contract intended to restrain or prevent competition in the supply or price of any article or commodity in general use in this state, or constituting a subject of trade or commerce therein, * * * shall, upon proof

thereof, in any court of competent jurisdiction, have its charter or authority to do business in this state canceled and annulled." St. Wis. 1911, § 1791j.

In construing the statute, the court said: "It is obvious that the statute is directed against contracts which are violative of the public policy of the state respecting restraints of trade and competition in the supply of any commodity in general use constituting a subject of commerce. The furnishing of telephone service may be classed within the general terms of the statute as the supplying of a commodity constituting a subject of commerce."

There the court was dealing under the statute with "the supply or price of any article or commodity," and, under the statute, furnishing a telephone service might be stretched to mean the supply of a commodity, but the language of section 2 of the Clayton Act forbids such construction of the word "commodity" as there used.

It follows that the plaintiff under the facts of this case is not entitled to the relief for which it prayed either under the Sherman Anti-Trust Act or the Clayton Act. But, if in the operation of its busses its property has been damaged or destroyed, it has a remedy at law, but, under the facts of this case, it is not entitled to equitable relief.

The decree of the District Court is affirmed.