CITY OF NEWARK, Newark, Delaware, City of Milford, Milford, Delaware, Town of Smyrna, Smyrna, Delaware, Plaintiffs,

v.

DELMARVA POWER & LIGHT COMPANY, Defendant.

CITY OF NEW CASTLE, New Castle, Delaware, Plaintiff,

v.

DELMARVA POWER & LIGHT COMPANY, Defendant.

Civ. A. Nos. 77–254, 77–296.

United States District Court, D. Delaware.

Jan. 8, 1979.

Thomas G. Hughes, O'Donnell & Hughes, Wilmington, Del., Wallace L. Duncan, James D. Pembroke, Philip L. Chabot, Jr., and J. Cathy Lichtenberg, Duncan, Brown, Weinberg & Palmer, Washington, D.C., William C. Brashares, and David H. Coffman, Cladouhos & Brashares, Washington, D.C., for plaintiffs in Civ.A. No. 77–254.

Charles S. Maddock, Edward W. Cooch, Jr., and Richard R. Cooch, Cooch & Taylor, Wilmington, Del., for plaintiffs in Civ.A. No. 77–296.

E. Dickinson Griffenberg, Jr., Potter, Anderson & Corroon, Wilmington, Del., Taylor R. Briggs, and Robert F. Cushman, LeBoeuf, Lamb, Leiby & MacRae, New York City, for defendant.

## OPINION

STAPLETON, District Judge:

These two antitrust actions have been consolidated for consideration of certain preliminary issues. The plaintiffs in Civil Action No. 77–254 are the town of Smyrna and the cities of Newark and Milford. In Civil Action No. 77–296, the plaintiff is the City of New Castle. Each of the plaintiffs is a municipal corporation which owns and operates an electric distribution system in

Delaware and which currently purchases all of its electric power requirements from the defendant, Delmarva Power and Light Company ("Delmarva"). Delmarva owns and operates facilities for the production, transmission and sale of electric power. It sells electric power on a retail as well as a wholesale basis.

In virtually identical complaints, the plaintiffs allege three violations of the antitrust laws by Delmarva. They allege that Delmarva has monopolized, attempted to monopolize, and conspired with its subsidiaries[1] to monopolize interstate trade and commerce in the wholesale and retail distribution of electricity, all in violation of Section 2 of the Sherman Act. They further claim that Delmarva is imposing unreasonable restraints on interstate trade and commerce in the sale of electricity in violation of Section 1 of the Sherman Act. Finally, the complaints allege that Delmarva has substantially lessened competition in violation of Section 2(a) of the Clayton Act.[2]

Delmarva has moved, pursuant to F.R. Civ.P. 12(b)(1), to dismiss both actions for lack of jurisdiction or, in the alternative, to stay the actions pending a determination of certain issues by the Federal Power Commission ("FPC").[3] It has also moved to dismiss the claim in Civil Action No. 77–254 arising under Section 2(a) of the Clayton Act for failure to state a claim upon which relief can be granted. Delmarva's third pending motion is one for partial summary judgment in which it asserts that the plaintiffs in Civil Action No. 77–254 have released Delmarva from any claim in that action which accrued before March 31, 1976.

## I. THE "JURISDICTIONAL" ISSUE.

Delmarva supplies electric power to plaintiffs at a wholesale rate that is within

1. Delmarva Power and Light Company of Maryland and Delmarva Power and Light Company of Virginia.

2. New Castle has amended its complaint to allege a violation of Section 3 of the Clayton Act, rather than Section 2(a).

3. As of October 1, 1977, the Federal Power Commission became defunct and certain of its responsibilities, including the "establishment,

review, and enforcement of rates, and charges for the transmission or sale of electric energy," were transferred to the Federal Energy Regulatory Commission. Department of Energy Organization Act, Pub.L. 95–91, 91 Stat. 565, and Executive Order No. 12009, 42 Fed.Reg. 46267. For convenience, however, the agency having jurisdiction over Delmarva's wholesale transfers will be referred to as the FPC.

the jurisdiction of the FPC. Plaintiffs then sell this power to residential and industrial customers in their respective geographic areas. Delmarva also supplies electric power directly to residential and industrial customers in these areas at a retail rate that is within the jurisdiction of the Delaware Public Service Commission ("PSC"). It is alleged that the retail rate that Delmarva has charged its retail customers since 1970 has been lower than the wholesale rate that it has charged the plaintiffs.

Plaintiffs charge that Delmarva has intentionally undertaken and implemented a scheme designed to drive them from the marketplace. The scheme is said to have a number of facets. First, Delmarva is alleged to have intentionally filed and prosecuted its rate applications before the FPC and the Delaware PSC in such a manner as to produce wholesale rates for the plaintiffs which are unreasonably high and discriminatory in relation to the preferential rate charged defendants' retail customers. The resulting "price squeeze" of the plaintiffs, which is alleged to be the objective of this portion of Delmarva's scheme, is said to make it impossible for the plaintiffs to compete with Delmarva in the retail market. In addition, it is alleged that Delmarva, as a term and condition of sale to the plaintiffs, *inter alia*, (1) prevented the plaintiffs from furnishing power to any party who has been receiving electric service from Delmarva, (2) prevented them from constructing transmission facilities, and (3) refused to wheel or transmit power purchased by the plaintiffs from other sources.

In response to these allegations, Delmarva contends that both its retail rates and its wholesale rates have been approved by the appropriate state and federal regulatory authorities after they have conducted hearings, weighed evidence, and applied their unique knowledge of the industry and extensive expertise in rate matters. Because of this regulatory supervision, Delmarva maintains that its pricing activities are immune from attack under the antitrust laws. Two theories of antitrust immunity are urged. First, Delmarva relies on the doctrine of *Parker v. Brown*, 317 U.S. 341, 63

S.Ct. 307, 87 L.Ed. 315 (1943), that the antitrust laws do not prohibit a State, acting as sovereign, from imposing certain anticompetitive restraints in the implementation of its governmental policy. Delmarva reasons that its retail rates, which are subject to the exclusive regulation of the PSC, a state agency, are immune from attack under the antitrust laws. Second, Delmarva contends that the FPC has exclusive jurisdiction to determine the reasonableness of its wholesale rates, and that holding it liable under the antitrust laws would undermine the regulatory scheme which Congress fashioned in the Federal Power Act.

While Delmarva frames its motion in terms of a lack of subject matter jurisdiction, there is no substantial question about this Court's jurisdiction over these cases. This Court has subject matter jurisdiction over a complaint which purports to state a claim under the antitrust laws. The question is whether the complaint states a claim upon which relief can be granted by this Court. Here also, however, the area left for controversy is quite narrow. Delmarva concedes, as it must after *Otter Tail Power Company v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), that the Federal Power Act bestows no blanket antitrust immunity on electric utilities whose activities it regulates and that, in this sense, the FPC does not have exclusive jurisdiction over the subject matter of these cases. Delmarva likewise concedes, as it must after *Cantor v. Detroit Edison Company*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), that *Parker v. Brown* is similarly limited in its effect. Thus, Delmarva acknowledges, for example, that if it in fact had undertaken a plan to drive the plaintiffs from the retail market and pursuant to that plan had refused to wheel power for the plaintiffs, this Court, despite the existence of the state and federal regulatory programs, could grant relief under the antitrust laws.

Delmarva's argument is more accurately phrased, I believe, in terms of whether all or some of the relief sought by plaintiffs is

barred because it would involve unacceptable federal intrusion into state policy or would undermine effective implementation of the Federal Power Act. Specifically, Delmarva maintains that the state regulation of its retail rates and the federal regulation of its wholesale rates forecloses this Court from granting either injunctive relief or damages based upon the relationship between its retail and wholesale prices. While there is some merit to that argument, it is substantially overstated.

Title 26 of the Delaware Code contains a typical program of state public utility regulation. Investor-owned utilities like Delmarva retain the right to determine their retail rates in the first instance. The PSC, however, is authorized to, and does, require the filing of tariffs sixty days before the initiation of a new rate. If, after a hearing, the PSC finds that the new rate is "unjust, unreasonable, or unjustly discriminatory, or in any wise a violation of law," it is required to determine the "just and reasonable rate to be charged" and "fix the same by order." In determining the just and reasonable rate, the Delaware General Assembly has decreed that the PSC shall not only safeguard the consumer's interest in reasonable and non-discriminatory rates, but also that it shall safeguard the economic welfare and efficiency of the utility involved. The statute directs utilities to charge the filed rate and none other. 26 Del.C. §§ 301, 303, 304, 308, 309 and 311.

The federal regulation of Delmarva's wholesale rates follows a similar pattern. As the Supreme Court stressed in *Otter Tail*, "Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships [which] . . . are governed in the first instance by business judgment and not regulatory coer-

cion." 410 U.S. at 374, 93 S.Ct. at 1028. But in the federal scheme, as in the state, the supervising agency has the duty to review the rates filed with it and to fix a different rate whenever it determines that the privately determined rate is unjust, unreasonable, or discriminatory. It is illegal for anyone to charge other than the filed rate. 16 U.S.C. § 824d(d).

After reviewing the *Parker* case and its progeny in *Mobilfone v. Commonwealth Telephone Company*, 571 F.2d 141 (3d Cir. 1978), the Third Circuit Court of Appeals held that Congress did not intend the antitrust laws to regulate activity which is conducted pursuant to a state directive where (1) the state has an independent regulatory interest, (2) the state has a clearly articulated policy with regard to that interest, and (3) the state's supervision is active. Delaware's scheme for regulating retail utility rates meets the *Mobilfone* criteria. Delaware has an important interest in whether her citizens are forced to pay unreasonably high or discriminatory rates and in whether public utilities serving her citizens remain financially sound and capable of delivering the energy needed. Moreover, Delaware has articulated a policy with respect to this interest in Title 26 of the Delaware Code, and the PSC maintains constant supervision over the rate filings of utilities.[4] Thus, if the PSC had jurisdiction over both Delmarva's wholesale rate and its retail rate and plaintiffs' attacks were limited to Delmarva's having charged disparate rates fixed or accepted by the PSC, no antitrust claim would have been stated in the complaint.[5]

On the federal side, plaintiffs acknowledge that if they were simply challenging a differential between two rates under the jurisdiction of the FPC and Congress had bestowed upon the FPC the power to guard against or compensate for the anticompeti-

---

4. In the six years from 1970 to 1975, for example, Delmarva filed four proposed rate increases for the category which includes industrial and commercial customers. In each instance the PSC fixed a rate below that requested. According to Delmarva, the rate fixed by the PSC was on an average 28% less than the rate filed by Delmarva.

5. *See Jeffrey, et al. v. Southwestern Bell, et al.*, 518 F.2d 1129 (5th Cir. 1975); *Gas Light Co. v. Georgia Power Co.*, 440 F.2d 1135 (5th Cir. 1971). This would be true, as I read the *Mobilfone* case, whether or not the possible effects on competition are considered by the state agency in the course of its deliberations.

tive aspects of that differential, then it could be inferred that Congress intended the administrative remedy to be an exclusive one. Plaintiffs stress that their case is different from these hypothetical cases, however, for two reasons. First, they point out that they do not seek injunctive relief against Delmarva's charging the filed rate, but rather against multifaceted anticompetitive activities of Delmarva which are unrelated to its conduct at the time of sale. Second, plaintiffs stress that while the FPC has authority to consider the differential between Delmarva's retail and wholesale rates, neither it nor the PSC has the power to protect fully against or compensate for the anticompetitive effects of a "price squeeze". Plaintiffs' initial distinction is a persuasive one; the latter is not.

Plaintiffs claim that Delmarva has utilized the power and authority left to it under the state and federal regulatory programs to pursue an anticompetitive scheme. It is alleged to have used its power to *initiate* rates, for example, to attempt to obtain an anticompetitive rate structure. Plaintiffs seek an injunction against a repetition of this and other forms of anticompetitive conduct in the future. They do not seek to enjoin Delmarva from charging the present filed rates so long as they are in effect. In this respect, plaintiffs' case is like that of the plaintiff in *Georgia v. Pennsylvania Railroad Company,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). There Georgia charged a conspiracy between common carriers to fix shipping rates in a manner which discriminated against Georgian products. It sought an injunction against agreements between the defendant railroads on what rates they would file with the Interstate Commerce Commission. The Supreme Court held that, while a recovery of damages would be inconsistent with the regulatory scheme established by Congress in the Interstate Commerce Act, an injunction against the defendant's anticompetitive manner of initiating rates would be entirely consistent with that scheme. The Court there observed:

> . . . Georgia in this proceeding is not seeking an injunction against the con-

tinuance of any tariff; nor does she seek to have any tariff provision cancelled. She merely asks that the alleged rate-fixing combination and conspiracy among the defendant-carriers be enjoined. As we shall see, that is a matter over which the Commission has no jurisdiction. And an injunction designed to put an end to the conspiracy need not enjoin operation under established rates.

324 U.S. at 455, 65 S.Ct. at 725.

Similarly, the injunctive relief which plaintiffs seek in this case can be granted without interfering with either the Delaware regulatory scheme or that of the Federal Power Act. For this reason alone, Delmarva's motion to dismiss cannot be granted.

In *FPC v. Conway,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), the Supreme Court held that the FPC has a duty to consider price squeeze allegations made by a utility's wholesale customers when it is deciding whether a proposed wholesale rate is just, reasonable, and nondiscriminatory. The Court recognized that the FPC could not order an increase in the state supervised retail rate in instances where a price squeeze was found to exist, but noted that relief could be afforded by the FPC's fixing the rate at the "lower boundary" of the range of reasonableness and directing a refund of the charges previously collected subject to refund.

Plaintiffs correctly point out that neither the FPC nor the PSC has full authority over the relationship between a utility's retail and wholesale rates and that, while the FPC can consider that relationship, it cannot afford a complete remedy in cases where the retail rate is so low that a price squeeze would continue to exist with the wholesale rate reduced to the lower boundary of the range of reasonableness. They also point out that neither the FPC nor the PSC has authority to award reparations. Plaintiffs conclude that the availability of antitrust relief in this Court is essential to fill these gaps in the regulatory programs.

There is some support for the plaintiffs' position. Both the District Court and the Court of Appeals in *City of Mishawaka v. Indiana & Michigan Electric Company,*[6] in holding that all forms of antitrust relief are available in a price squeeze situation, stressed the fact that, while each rate was controlled by a governmental agency, the relationship between the two was not regulated by either agency and neither could alone fully protect against the anticompetitive effects of a price squeeze. Judge Lord in *City of Shakopee v. Northern States Power Company,* Civil No. 4–75–591 (D.Minn. Oct. 19, 1976) adopted a similar rationale:

> The discrimination alleged here is not between rates set by one regulatory agency . . . but rather is between the "wholesale" rate set by the FPC and the "retail" rate over which the FPC has no jurisdiction. Put simply, under these circumstances, antitrust immunity is not "necessary" to the functioning of the regulatory process because the discrimination is "external" to that process. The FPC does not control both ends of the discriminatory conduct.

With deference, I suggest that the relevant inquiry is not whether exercise of antitrust jurisdiction by federal courts and the granting of particular forms of antitrust relief would provide regulation and relief which Congress did not provide in the Federal Power Act. The relevant inquiry, I believe, is whether the exercise of antitrust jurisdiction or the granting of a particular form of antitrust relief would be inconsistent with or disruptive of the work which Congress contemplated the FPC would do and the work which it contemplated state regulatory agencies would be left free to do.

The rationale of the *Parker* line of cases, as interpreted in *Mobilfone,* is that Congress when it enacted the antitrust laws chose not to interfere with activity authorized by a state in active pursuit of an established state policy. The regulation of the retail rates of public utilities has long been regarded as a legitimate exercise of state authority and Congress on many occasions has seen fit to reserve that authority to the states. As the Supreme Court noted in *Conway,* for example, the FPC rate fixing power under the Federal Power Act was "expressly limited to jurisdictional sales to foreclose the possibility that the Commission would seek to correct an alleged discriminatory relationship between wholesale and retail rates by raising or otherwise regulating the nonjurisdictional, retail price." 426 U.S. at 277, 96 S.Ct. at 2003. With this background, I consider it unlikely that Congress intended a federal court to impose liability on a public utility for charging a retail rate which a state has authorized it to charge and, in this context, the fact that plaintiffs' claim is based on two rates, only one of which is within the jurisdiction of the PSC, seems irrelevant. Delaware has authorized Delmarva to sell to retail customers within its boundaries at rates fixed by the PSC and Delmarva has done so. A judgment awarding damages on the theory that higher rates should have been charged would constitute no less of an interference with the Delaware regulatory program in a suit where the plaintiff has attacked the effect of a price squeeze between state and federally regulated rates than it would in a suit where he has attacked only the state regulated rate. Accordingly, I conclude that this Court would be barred from entering a treble damage award based upon a finding that Delmarva's retail rates since 1970 should have been higher.

I reach the same conclusion with respect to this Court's power to enter a treble damage award based on a finding that Delmarva's wholesale rates since 1970 should have been lower than the rates on file with the FPC. The Federal Power Act contemplates that the expert eye of the FPC will oversee the wholesale rates of public utilities in order to protect the public interest. That public interest involves not only the potential economic burden which

6. C.A. No. S 74–72 (D.Ind. May 1, 1975), *aff'd,* 560 F.2d 1314 (7th Cir. 1977).

the proposed rate will place on the public but also the potential of any rate to jeopardize the ability of the utility to continue its service.[7] In order to effectuate that objective, Congress provided for filing and review of rates and decreed that it would be unlawful for anyone to charge more or less than the filed rate. At the heart of the scheme is the concept that no one has a right to pay or to receive any price other than a price fixed or accepted by the FPC. As the Supreme Court put it in *Montana-Dakota v. Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951), one "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms."

In comparable situations governed by the Interstate Commerce Act, the Supreme Court has consistently held that the federal courts are barred from awarding antitrust damages on the theory that, but for the defendants' anticompetitive conduct, the rate paid by the plaintiffs would have been a rate other than the filed rate. *E. g.*, *Keogh v. Chicago & N. W. Railway Company*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1923); *Georgia v. Pennsylvania Railroad Company*, *supra*. The Fifth Circuit Court of Appeals has taken the same position where customers of a gas utility whose rates were subject to the jurisdiction of the FPC under the Natural Gas Act attempted to recover damages under the Sherman and Clayton Acts alleging that the utility's monopoly position had resulted in excessively high rates. *McLeran v. El Paso Natural Gas Company*, 357 F.Supp. 329 (S.D.Tex. 1972), *aff'd without opinion*, 491 F.2d 1405 (5th Cir. 1974).

■ Plaintiffs seek to distinguish these cases principally on three grounds. First, it is said that the Interstate Commerce Act embodies a more "pervasive" regulatory scheme than the Federal Power Act. "Pervasiveness," however, must be judged in

context. Insofar as *rates* and the potential of a damage award for interference with a Commission approved rate structure are concerned, I perceive no difference between these two Acts.[8] Second, plaintiffs point out that these cases involve direct attacks upon Commission approved rates and not an attack upon a rate *differential* which the FPC does not have full power to control. As noted above, however, the question is not whether an antitrust damage award would fill a gap left by Congress in the Federal Power Act, but, rather, whether such an award might undermine what Congress sought to accomplish in that Act. When one looks at potential for conflict with the Commission sanctioned rate structure, it would appear no less in this case than in the *Keogh, Georgia* and *McLeran* cases.

Finally, plaintiffs stress that the Interstate Commerce Act bestows upon the ICC the power to grant reparations and that the *Keogh* decision is based in part upon the view that Congress must have intended the reparations remedy to be exclusive of a treble damage remedy. While this is a distinction between the two Acts, I do not find it a significant one in the context of attempting to ascertain whether Congress intended that courts exercising antitrust jurisdiction would determine what a wholesale rate should have been during an earlier period and award treble damages accordingly.

■ The Congressional decision not to allow the Commission to determine retroactively what would have been a reasonable rate and award the difference between that and the filed rate was a deliberate one. *Montana-Dakota v. Pub. Serv. Co., supra.* In the Federal Power Act, as in other rate regulation areas where similar schemes have been adopted, Congress sought to strike a balance between the seller and its customers. *T. I. M. E., Inc. v. United States*, 359 U.S. 464, 479, 79 S.Ct. 904, 3

---

7. *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

8. The same is true of the Natural Gas Act and the Federal Power Act: they provide almost identical regulatory schemes.

L.Ed.2d 952 (1959) (interpreting a similar regulatory structure in the Motor Carriers Act). While the right to award reparations to purchasers was withheld, the utilities' preexisting rights to set its own rates and put them into immediate effect were significantly curtailed. Any change in rate requires thirty days notice and the Commission may thereafter suspend the effectiveness of the change for five months. Even after the five months have passed the Commission may require the utility to take the necessary steps to be able to refund any portion of the increase ultimately found to be unjustified. 16 U.S.C. § 824d(d) and (e).

While it is true that the FPC cannot award reparations, it is not true that the Act leaves a wholesale customer remediless in a price squeeze situation. He may intervene when a rate is proposed and seek to have it become effective subject to a refund after the Commission has had the opportunity to pass upon the price squeeze allegations. This is not as broad a remedy scheme as the reparation provisions of the Interstate Commerce Act, but I fail to perceive what one can reliably infer about antitrust jurisdiction from Congress' selection of this alternative remedy scheme in the Federal Power Act. If anything, Congress' unwillingness to give the FPC power to alter rate schedules retroactively even when it finds anticompetitive activity counsels this Court against doing the same thing pursuant to its antitrust jurisdiction. *Cf. Montana-Dakota v. Pub. Serv. Co., supra.*

Thus, I find the *Keogh, Georgia* and *McLeran* cases indistinguishable in any material respect and am constrained to follow them. I hold that an award of antitrust damages measured by the difference be-

tween the filed rate and whatever rate this Court might determine would have prevailed but for a defendant's anticompetitive conduct is foreclosed. I am not yet persuaded, however, that all possible forms of damage relief in this case would be contrary to the intent of Congress. There is a variety of anticompetitive conduct alleged in the complaint which may have affected the plaintiffs in a variety of ways. I think it wiser to require that a fuller record be developed before the possibility of a damage recovery is ruled out.

## II. "PRIMARY JURISDICTION."

■ Delmarva urges that, if this action is to proceed, the issues of liability and relief should be referred to the FPC.[9] I believe that the FPC's exercise of primary jurisdiction with respect to the price squeeze issues would be of material aid to the Court. Nevertheless, I conclude that a stay of these cases at this time would be inappropriate.

Delmarva's defense to the plaintiffs' "price squeeze" allegations is that the differential between its wholesale and retail rates is not attributable to an anticompetitive scheme on its part, but rather to such factors as the cost of providing service to different classes of customers, the nature and mechanics of the regulatory processes, and the application of different standards by federal and state regulators. Delmarva correctly points out that these areas are ones in which the FPC has significant expertise and this Court has little prior experience. It then goes on to note that there is a proceeding currently pending before the Commission in which the plaintiffs in these cases have raised the "price squeeze" issue and in which the PSC may intervene.

---

**9.** Delmarva also has urged that this Court refer its "jurisdictional" issue to the FPC. Its authority for this approach is *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). I find the *Ricci* case distinguishable and consider the "jurisdictional" issue one solely for the Court. In *Ricci,* the plaintiff alleged that the termination of his Exchange membership violated both the Sherman Act and the regulations promulgated under the Commodity Exchange Act. The Court held that the task of reconciling the two Acts was that of the court but approved a stay pending Commission resolution of the question whether defendants' conduct violated the regulations, noting that if that conduct was not sanctioned by the Commodities Act, there would, in all likelihood, be no reason to consider reconciliation of the two regulatory programs. In this case, however, there is no dispute as to whether Delmarva charged the filed rate as required by the Federal Power Act and the task of reconciling the antitrust laws with that Act cannot be avoided.

On May 31, 1978, Delmarva tendered new rates for filing with the FPC. Docket No. ER–78–414. Plaintiffs applied to intervene. On June 30, 1978, the Commission granted intervention, accepted the tendered rates for filing, suspended their effectiveness until December 1, 1978, and provided that they would be collected subject to refund after that date. On August 25, 1978, the Commission further ordered that the proceedings with respect to the proposed rates would include a "price squeeze investigation" pursuant to the provisions of 18 C.F.R. § 2.17, 42 Fed.Reg. 16131.

It is likely that a number of issues which will confront this Court in ruling upon plaintiffs' claims for injunctive relief against anticompetitive rate filings will be presented to and be resolved by the Commission in Docket No. ER–78–414. It would be of great assistance to this Court for the Commission, perhaps with the aid of the Delaware PSC, to develop and determine those issues prior to the trial of these cases. Accordingly, unless the proceedings currently before the Commission are unduly delayed, this Court will await the outcome of those proceedings.

I will not, however, stay these cases at this time. It is unlikely that the Commission will have occasion in Docket No. ER–78–414 to make findings about the existence of a price squeeze on any date in the past. The Commission has noted its inability to award reparation and has indicated that data requests will not be permitted in price squeeze proceedings if they reach "too far back in history." 42 Fed.Reg. 16132. Thus, to the extent plaintiffs desire to support their "price squeeze" allegations with evidence from past years, it may be necessary for them to supplement their data requests before the Commission with discovery in this Court. So long as plaintiffs wish to pursue discovery in this Court during the course of Docket No. ER–78–414, I see no reason why development of that evidence need be postponed.

More important, there are a number of issues before this Court other than the price squeeze issues. While Delmarva asserts generally in its brief and in the affidavit of Earl D. Krapf that the Commission's expertise is essential to the determination of those other issues, the argument is not developed and I lack sufficient knowledge at this stage to be able to tell exactly what will be involved in their resolution. I am not persuaded that Commission consideration of those issues would be helpful or even that there is an avenue by which plaintiffs might bring them before the FPC for consideration.[10] If it should subsequently appear that Commission consideration is both feasible and desirable, the doctrine of primary jurisdiction can be applied at that time. *United States v. American Telephone and Telegraph Co.,* 427 F.Supp. 57 (D.D.C.1976). I see no reason why discovery should not proceed in the interim.

## III. THE ROBINSON–PATMAN ISSUE.

Paragraph 11 of the respective complaints alleges that Delmarva "has substantially lessened competition in violation of Section 2(a) of the Clayton Act," as amended by the Robinson-Patman Act. Delmarva has moved to dismiss the allegations of Paragraph 11 for failure to state a claim upon which relief can be granted, arguing that electricity is not a "commodity" within the meaning of Section 2(a). New Castle amended its complaint in Civil Action No. 77–296 so as to eliminate this claim under the Robinson-Patman Act. Therefore, this motion relates only to the plaintiffs in Civil Action No. 77–254: Newark, Milford and Smyrna.

Section 2(a) makes it unlawful for anyone engaged in interstate commerce to discriminate in price, "between different purchasers of commodities of like grade and quality" when the effect may be substantially to lessen competition or to tend to create a monopoly. The parties agree that in this context the word "commodities" re-

10. *See Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

fers to tangible articles of commerce [11] but disagree on whether electric power comes within that category. There is no case law which is particularly helpful in resolving this issue.[12] It is one of Congressional intent, however, and the wording of the statute, its legislative history, and the regulation of the electric utility industry which existed at the time the adoption of the Robinson-Patman Act, all suggest that "commodity" was not intended to encompass electric power.

Section 2(a) of the Clayton Act [15 U.S.C. § 13(a) as amended in 1936] provides as follows:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: Provided, however, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: And provided further, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

---

11. See Fleetway, Inc. v. Public Service Interstate Transportation Co., 72 F.2d 761, 763 (3d Cir. 1934), cert. denied, 293 U.S. 626, 55 S.Ct. 347, 79 L.Ed. 713 (1935). See also Morning Pioneer, Inc. v. Bismark Tribune Co., 493 F.2d 383, 389 n. 11 (8th Cir. 1974), cert. denied, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1975) ("the term 'commodity' . . . is generally thought to include only tangible items of commerce and not services"); Baum v. Investors Diversified Servs., Inc., 409 F.2d 872, 875 (7th Cir. 1969) (the term "commodity" is "restricted to products, merchandise or other tangible goods"); Tri-State Broadcasting Co. v. UPI, 369 F.2d 268 (5th Cir. 1966) ("Section 2(a) of the Act was intended to encompass only tangible articles of commerce"); W. Patman, Complete Guide to the Robinson-Patman Act 33 (1963);

F. Rowe, Price Discrimination Under the Robinson-Patman Act 59–62 (1962); Stockells, Federal Control of Business—Antitrust Laws § 129, at 449–50 (1972); Rowe, Discriminatory Sales of Commerce: Jurisdictional Criteria Under the Robinson-Patman Act, 67 Yale L.J. 1163–65 (1958).

12. None of the cases cited by plaintiffs decide the issue of whether the terms commodity in Section 2(a) includes electric power. See, e. g., Morning Pioneer, Inc. v. Bismark Tribune Co., 493 F.2d 383 (8th Cir. 1974), cert. denied, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1975); Baum v. Investors Diversified Services, Inc., 409 F.2d 872 (7th Cir. 1969).

It is to be noted that "commodities" is here used in the context of items of "like grade and qualities" and as synonymous with "goods, wares or merchandise." These terms are not commonly applied to electric power. Moreover, the statute appears to preserve a right to select one's own customers in "bona fide transactions," a right not traditionally accorded to public utilities.

The section read as a whole reflects a concern about price discrimination with respect to manufactured products and consumer goods. The legislative history, reflecting the same concern, relates entirely to competitive problems then existing in the distribution of goods which conventionally were sold through a supplier-wholesaler-retailer channel that was being invaded by grocery chains and retail order houses.[13] The House and Senate Reports, for example, refer to "goods, wares and merchandise" in discussing the scope of Section 2(a)[14] and Representative Patman, when introducing his bill, spoke in terms of "food and merchandise distribution" and "huge chain stores."[15]

Even more significant is the fact that the Congress which passed the Robinson-Patman Act in 1936 had a year earlier amended the Federal Power Act to provide for FPC review of all rates charged for the transmission or sale of electric power subject to its jurisdiction. The amendment, drawing from the Interstate Commerce Act, included a directive that the FPC review any disparity in rates between categories of purchasers so as to prohibit unreasonable

discrimination. *St. Michaels Utilities Commission v. FPC*, 377 F.2d 912 (4th Cir. 1967). When this amendment was enacted Congress must have contemplated that the FPC and the courts would develop decisional rules for determining which differentials are discriminatory and which are not, as they have in fact done. *St. Michaels Utilities Commission v. FPC, supra.* Given the existence of this regulatory scheme in 1936 and the prevalence of state regulation of intrastate sales which Congress expressly reserved to the states in the Federal Power Act, I think it unlikely that Congress intended electric utility rates to be subject to the Robinson-Patman Act rules governing justified or unjustified price differentials or to the authority of the Federal Trade Commission "to fix and establish quantity limitations."

For these reasons, I conclude that electric power is not a "commodity" within the meaning of the Robinson-Patman Act and that the plaintiffs' claims under that Act must be dismissed.

## IV.  THE RELEASE ISSUE.

Delmarva's third motion is one for partial summary judgment on the claims in Civil Action No. 77–254 arising on or before March 31, 1976. It asserts that the plaintiffs in that action have released Delmarva from those claims.

On August 1, 1974, Delmarva tendered new wholesale rate schedules to the FPC for filing. These schedules went into effect, subject to refund, on October 26, 1974,

---

**13.** Rowe, *Price Discrimination Under the Robinson-Patman Act* (1962) Chapter 1.

**14.** H.R.Rep.No.627, 63d Cong., 2d Sess. 8. *See also* S.Rep.No.698, 63d Cong., 2d Sess. 2–4.

**15.** [T]his bill insures to the independent dealer who buys one carload, whether of groceries, dry goods, hardware, or any other commodity, the same price that is given to the chain buying 10 carloads of the same goods, unless that chain can show a concrete saving in cost resulting from its method of purchase and delivery. . . .
*Id.*
In presenting the bill to the House Judiciary Committee, Representative Patman said:

[T]he day of the independent merchant is gone unless something is done and done quickly. He cannot possibly survive under that system. So we have reached the crossroads; we must either turn the food and grocery business of this . . . country over to a few corporate chains, or we have got to pass laws that will give the people, who built this country in time of peace and who saved it in time of war, an opportunity to exist. . . .
Hearings on H.R. 8442, 4995, and 5062 before the House Committee on the Judiciary, 74th Cong., 1st Sess., 5–6 (1935).

and a hearing was scheduled. FPC Docket No, E–8947. The plaintiffs in Civil Action No. 77–254, along with other municipalities and the PSC, were granted leave to intervene in the proceeding. On April 24, 1975 the Court of Appeals for the District of Columbia held in *Conway Corporation v. Federal Power Commission*, 167 U.S.App. D.C. 43, 510 F.2d 1264 (1975), that the FPC must consider so-called "price squeeze" allegations in its ratemaking process. Subsequently, on June 10, 1975, the plaintiffs filed an Amended Petition to Intervene, in which they alleged that Delmarva was engaging in price-squeeze activities. After the United States Supreme Court affirmed the decision of the Court of Appeals in the *Conway* case, the FPC reopened the record for further proceedings on the price-squeeze issue.

On February 14, 1977, Wallace Duncan, Esquire executed a Stipulation and Agreement of Settlement ("the Settlement Agreement") on behalf of the plaintiffs. Delmarva contends that the Settlement Agreement releases Delmarva from all of the claims now pressed by the plaintiffs which arose on or before March 31, 1976.

By the time of settlement, Delmarva had filed new rate schedules which went into effect, subject to refund, on April 1, 1976, and which became the subject of an independent proceeding. Accordingly, the scope of the proceeding known as Docket No. E–8947 had been narrowed by the time of settlement to the question of what the wholesale rate should be for the period between August 26, 1974 and March 31, 1976, this being the rate which would determine the amount of refund, it any, to be awarded to the intervenors. In the Settlement Agreement the parties agreed upon a formula for determining a wholesale rate to be effective during that period and provided that intervenors would receive refunds measured by the difference between the agreed upon rate and the rate charged subject to refund, with 9% interest. The Settlement Agreement was conditioned upon its acceptance by the Commission and stipulated that the Commission would order the proceedings terminated. The rate increase

effectuated by the Settlement Agreement was 53% of Delmarva's requested rate increase and Delmarva paid $3.85 million, exclusive of interest, in refunds pursuant to the settlement. Of this amount, $670,000 went to the plaintiffs in this suit.

Paragraph 9 of the Settlement Agreement provides:

> If approved, it is specifically understood and agreed that this Agreement represents a compromise with respect to Delmarva's rate schedules; and, except as expressly stated herein no party shall be deemed to have approved, accepted, agreed or consented to any rate of return, ratemaking or tariff principle or any method of cost of service determination, cost allocation or rate design underlying or supposed to underlie any of the rates provided for herein. It is further specifically understood and agreed that all controverted issues in this proceeding, expressly including the *Summit* issue and the *Conway* issue, raised by the various Motions and the two Orders of the Commission thereon issued July 26, 1976 and referred to in Paragraphs 4 and 5 above, are settled insofar as any issue may relate to or derive from the rates established by settlement in this proceeding, all claims of the parties hereto with respect to all such issues for the period ending March 31, 1976 . . . having been settled and satisfied as a part of this aggregate settlement here submitted.

For present purposes the first step in determining the scope of this release is to gain an understanding of what was meant by the clause, "the *Conway* issue raised by the various motions and . . . Orders of the Commission . . . and referred to in Paragraph . . . 4 . . . above." The reference to *Conway* is, of course, a reference to *Conway v. FPC*. The motions of the intervenors and Delmarva's response put in controversy the issue of whether Delmarva's proposal for a wholesale rate increase and its failure to seek a retail rate increase had produced an unjustified rate disparity which foreclosed the in-

tervenors from competing for customers. The concluding paragraph of plaintiffs' motion to intervene, for example, alleged the following:

There being no justification for the rate disparity, the preclusion of competition for industrial customers between DP&L and the Municipal Intervenors by DP&L's rate structure constitutes a classic example of a "price squeeze", which is violative of the anti-trust laws and which is a matter which is clearly subject to this Commission's jurisdiction under Sections 205 and 206 of the Federal Power Act. *See Conway Corp. v. FPC,* 167 U.S.App. D.C. 43, 45, 510 F.2d 1264, 1266 (1975).

Similarly, Paragraph 4 of the Stipulation and Agreement refers to the intervenors having alleged that Delmarva had engaged in "certain anticompetitive practices . . through an unjustified disparity between its retail and wholesale rates." Paragraph 4 then goes on to recount that the Commission reopened the record for "further proceedings on the anticompetitive issue."

Given this background plaintiffs concede that the reference in Paragraph 9 to the *"Conway* issue" is a reference to the "price squeeze" issue. The second sentence of that paragraph thus records that the price squeeze issue "insofar as it may relate to . . . the rates established by settlement"[16] has been settled. It goes on to provide that "all claims" of the parties relating to that issue have been satisfied as a part of the settlement. The claims satisfied by the settlement, therefore, include a claim under the antitrust laws that the wholesale rate agreed upon in the settlement is a part of an anticompetitive price squeeze.

Plaintiffs' principal argument to the contrary is that the reach of Paragraph 9 is limited to issues which were presented in Docket No. E–8947 and to claims over which the Commission would have jurisdiction. They stress that there was no antitrust claim for treble damages in Docket No. E–8947 and that the FPC does not have jurisdiction over such claims. They also point out that the case which lent its name to the *"Conway* issue" dealt with a price squeeze issue *solely in the context of an* FPC ratemaking proceeding and did not involve an antitrust claim for past damages.

■ There are two problems with this argument. It ignores the obviously purposeful distinction in Paragraph 9 between "issues" and "claims" and it virtually deprives that paragraph of any meaningful effect. As noted, Paragraph 9 provides that the controverted *issues* in the proceeding are settled insofar as they may relate to the rates established by the settlement and then stipulates that all *claims* with respect to such issues are satisfied. The reference to issues is to issues presented in the proceeding. The reference to claims, however, is not limited to claims presented in Docket No. E–8947. Rather it is a reference to "all claims with respect to" an issue in that proceeding insofar as it relates to the agreed upon rate schedule. The evident purpose of the provision as a whole is to foreclose subsequent attacks upon the agreed upon rate schedule on any ground raised in Docket No. E–8947. Thus, I am persuaded that Paragraph 9 of the Settlement Agreement bars the plaintiffs from asserting any claim in this Court, whatever its basis, which is related to the price squeeze issue and the rates established by the settlement. This would clearly include a claim that the wholesale rate during the period from October 26, 1974 to March 31, 1976 would, in the absence of the price squeeze, have been less than the agreed upon rate.

This conclusion is bolstered by the fact that plaintiffs' interpretation of Paragraph 9, being limited as it is to claims over which

---

16. The language used in Paragraph 9 is somewhat inartful. The parties agree, however, that the controverted issues which "relate to" the agreed upon rates are those contested issues which have to be resolved in order to set a rate, *e. g.,* cost of service, cost allocation, rate of return, as well as the price squeeze issue and the *Summit* issue (i. e. the treatment to be accorded a large case settlement received by Delmarva upon the cancellation of a contract). While the reference to controverted issues which "derive from" the rates established by the settlement is less clear, one example would be the issue of the amount of the refund.

the Commission has jurisdiction, renders that paragraph virtually meaningless. Given the limited jurisdiction of the Commission with respect to rates paid in the past, one wonders what could have been the claim related to the agreed upon rates which the parties were concerned about being brought before the Commission after the settlement was approved, the refund paid, and the original proceeding terminated. The intervenors at that point could no longer seek a reduction of the rate for the period from October 10, 1974 to March 31, 1976, and, even if there had been such a proceeding available to institute, the settlement would clearly have barred their claims without Paragraph 9 in the Agreement. It is far more reasonable to infer that Paragraph 9 was designed to protect the agreed upon rates from attack by the parties in fora other than the Commission.

█ It does not follow, however, that Delmarva's motion to dismiss all damage claims accruing on or before March 31, 1976 should be granted. While Paragraph 9 is broader than plaintiffs maintain, it has three relevant limitations. First, it is limited to rate related matters and does not encompass plaintiffs' damage claims based on Delmarva's alleged failure to wheel and the other "non-price squeeze" allegations. Second, it does not apply to the time period before October 27, 1974. Finally, while it may be academic if the other rulings in this Opinion are correct, it seems quite clear from the wording of Paragraph 9 that the parties did not intend to foreclose further debate about the propriety or legality of the retail rate in effect between October 27, 1974 and March 31, 1976. Because of these limitations, Delmarva's motion must be denied.

### SUMMARY

The Federal Power Commission does not have exclusive jurisdiction over the subject matter of these actions and the complaints state claims under the Sherman Act. Some of the relief sought by plaintiffs would conflict, however, with the Delaware scheme for regulating retail rates or with the federal scheme embodied in the Federal Power Act and, accordingly, is barred. Final decision with respect to the scope of relief will await a fuller development of the record.

The Federal Power Commission has special expertise with respect to the price squeeze issues and this Court should have the benefit of that expertise. For this reason trial of this case will await the conclusion of the FPC's price squeeze inquiry in Docket No. ER–78–414. Because of the presence of issues not involved in that proceeding, however, discovery will proceed in these cases.

Electric power is not a "commodity" within the meaning of the Robinson-Patman Act and the claims asserted under that Act will be dismissed.

The Settlement Agreement entered by the parties in Civil Action No. 77–254 on February 14, 1977, bars any claim in that action that the wholesale rate during the period from October 26, 1974 to March 31, 1976, in the absence of a price squeeze, would have been less than the rate established by that Agreement. Delmarva's motion for summary judgment on all claims arising on or before March 31, 1976 will be denied, however, since the release effected by the Settlement Agreement is more narrow in scope than the relief which that motion seeks.